UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MARY LOU WALEN,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA, *et al.*,<br><br>Defendants. | Civil Action No. 15-1718 (BAH)<br><br>Chief Judge Beryl A. Howell |

**MEMORANDUM OPINION**

The plaintiff, Mary Lou Walen, brought this suit under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2674 *et seq.*, against the United States, the United States Department of the Interior ("DOI"), the National Park Service (the "NPS"), the National Capitol Region of the National Park Service (collectively, "the federal defendants"), and the District of Columbia to recover for serious injuries she sustained when a tree fell on her as she walked along Connecticut Avenue, NW, a central thoroughfare in Washington, D.C.  She alleges that the federal defendants and the District were negligent in inspecting and maintaining the trees bordering Connecticut Avenue, and in keeping records about those activities.  Pending before the Court is the government's motion to dismiss for lack of subject matter jurisdiction, on grounds that the claims asserted are barred by the discretionary function exception to the FTCA's waiver of sovereign immunity.  Gov't Mot. to Dismiss ("Gov't Mot."), ECF No. 14.[1]  As explained below, the United States is not immune from suit on the plaintiff's claim, while the federal agencies are not the proper defendants.  Thus, the government's motion is granted, in part, as to the federal agencies, but denied as to the United States.

---

[1] The District of Columbia has already answered the complaint.  Def. District of Columbia's Answer, ECF No. 10.

## I.  INTRODUCTION

On October 29, 2012, at approximately 3:15 p.m., the plaintiff "was walking along . . . the west side of Connecticut Avenue [Northwest] in the District of Columbia."  Compl. ¶ 7, ECF No. 1.  As she crossed the "Klingle Bridge," officially named the "Connecticut Avenue Bridge," which crosses over the Klingle Valley in Rock Creek Park, "suddenly and without warning, a tree limb struck [her], crushing her and causing her serious, severe and permanent injuries." Compl. ¶ 7, 9. [2]  As a result of the incident, the plaintiff suffered "twenty-three bone fractures, has endured multiple surgeries as well as significant rehabilitation . . . [and] has incurred hundreds of thousands of dollars of medical bills."  Pl.'s Opp'n Gov't Mot. Dismiss ("Pl.'s Opp'n") at 1, ECF No. 15.

After the incident, the plaintiff filed an administrative claim with DOI and, after no action was taken, deemed the claim denied and filed this suit.  Compl. ¶ 12; Pl.'s Opp'n at 2.  In her complaint, the plaintiff alleges that the defendants "exercised control over the trees in Rock Creek Park, . . . including specifically the trees along both sides" of the Connecticut Avenue Bridge, Compl. ¶ 10, and "owed a continuing duty of care . . . to inspect and maintain its trees and parks in a reasonably safe condition, with due regard for dangerous conditions that pose a risk to persons lawfully traveling" on the bridge "and/or Connecticut Avenue, NW," *id. ¶* 11. According to the plaintiff, the federal defendants "fail[ed] to exercise ordinary care in its inspection and maintenance of Rock Creek Park and its trees," "fail[ed] to keep adequate records of inspection and maintenance protocols for trees in [their] control in Rock Creek Park," and "fail[ed] to remove any and all trees, limbs, branches and/or debris that posed a threat of harm or

---

[2]      The complaint and the parties' briefing refer to the bridge where the tree fell as the "Klingle Bridge," *see* Pl.'s Opp'n Gov't's  Mot. at 1; Gov't's Mem. Supp. Mot. Dismiss at 1, ECF No. 14-1, but the official name is "Connecticut Avenue Bridge."  *See* National Park Service, Form No. 10-900, OMB No. 10024-0018, National Register of Historic Places Registration Form: Connecticut Avenue Bridge over Klingle Valley (2004), https://npgallery.nps.gov/AssetDetail/71bfd97a-048c-4ae2-abf0-df5368675ff3.  The official name of the bridge will be used in this Memorandum Opinion.

bodily injury in a timely manner."  Compl. ¶¶ 20 (Count I against United States), 27 (Count II

against DOI), 34 (Count III against NPS), 41 (Count IV against National Capital Region of

NPS), and 48 (Count V against DC).  After the plaintiff filed her complaint, the government filed

the instant motion to dismiss, which is ripe for review.[3]

## II.  LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), the

plaintiff bears the burden of demonstrating the court's subject-matter jurisdiction over the claims

asserted.  *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015).  "'Federal courts are courts of

limited jurisdiction,' possessing 'only that power authorized by Constitution and statute.'"  *Gunn*

*v. Minton*, 133 S. Ct. 1059, 1064 (2013) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*,

511 U.S. 375, 377 (1994)).  Indeed, federal courts are "forbidden . . . from acting beyond our

authority," *NetworkIP, LLC v. FCC*, 548 F.3d 116, 120 (D.C. Cir. 2008), and, therefore, have

"an affirmative obligation 'to consider whether the constitutional and statutory authority exist for

us to hear each dispute,'" *James Madison Ltd. ex rel. Hecht v. Ludwig*, 82 F.3d 1085, 1092 (D.C.

Cir. 1996) (quoting *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 196 (D.C. Cir. 1992)).  Absent

subject matter jurisdiction over a case, the court must dismiss it.  *Arbaugh v. Y & H Corp.*, 546

U.S. 500, 506–07 (2006); FED. R. CIV. P. 12(h)(3) (requiring dismissal of action "at any time"

the court determines it lacks subject matter jurisdiction).

---

[3]        The government moves to dismiss the claims against the federal agencies—DOI, NPS, and the National
Capitol Region of NPS—since the FTCA provides the exclusive remedy for tortious conduct by the United States,
which, consequently, is the only properly named defendant.  Gov't's Mot. at 2.  The government is correct.  *See* 28
U.S.C. §2679(b)(1) (providing that suit against the United States is "exclusive of any other civil action or
proceeding for money damages"); *Russell v. Dupree*, 844 F. Supp. 2d 46, 47 (2012) (dismissing federal agency from
FTCA suit because the United States is the proper defendant); *Hagmeyer v. U.S. Dep't of Treasury*, 647 F. Supp.
1300, 1304 (D.D.C. 1986) ("[T]he exclusive remedy for common law tort claims is an action against the United
States rather than against the individuals or the particular governmental agencies . . . .") (citing *Kline v. Republic of
El Salvador*, 603 F. Supp. 1313, 1316 (D.D.C. 1985)).  Thus, the pending motion to dismiss is granted with respect
to Counts II, III and IV against DOI, NPS and the National Capitol Region of NPS, respectively.

When considering a motion to dismiss under Rule 12(b)(1), the court must accept as true all uncontroverted material factual allegations contained in the complaint and "'construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged' and upon such facts determine jurisdictional questions." *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005)).  The court need not accept inferences drawn by the plaintiff, however, if those inferences are unsupported by facts alleged in the complaint or amount merely to legal conclusions.  *See Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).

Moreover, in evaluating subject matter jurisdiction, the court "may consider materials outside the pleadings."  *Am. Freedom Law Ctr. v. Obama*, 821 F.3d 44, 49 (D.C. Cir. 2016); *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1107 (D.C. Cir. 2005); *Herbert*, 974 F.2d at 197 (in disposing of motion to dismiss for lack of subject matter jurisdiction, "where necessary, the court may consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.").

## III. DISCUSSION

The plaintiff claims that the federal defendants were negligent in two respects, first in "failing to exercise ordinary care in its inspection and maintenance of Rock Creek Park and its trees" and second, in "failing to keep adequate records of inspection and maintenance protocols for trees in its control in Rock Creek Park."  Compl. ¶ 20.  While the FTCA waives the United States' sovereign immunity for certain torts, the government argues that the plaintiff's claims against the United States are nonetheless barred by the discretionary function exception to the FTCA because decisions related to tree care in Rock Creek Park, even where trees rooted in the Park grow sufficiently tall for the tree-tops to line a bridge along Connecticut Avenue's busy thoroughfare, are left to the discretion of the Park Superintendent and involve application of

"management ideals" and "balancing of" various policy considerations.  Gov't's Mem. Supp.

Mot. Dismiss ("Gov't's Mem.") at 5-9, ECF No. 14; Gov't's Reply Supp. Mot. Dismiss

("Gov't's Reply") at 9-11, ECF No. 19.  The scope of the discretionary function exception relied

upon by the government is addressed below, followed by analysis of whether this exception

applies to bar the plaintiff's claim in Count I against the United States.[4]

### A.  THE FTCA'S DISCRETIONARY FUNCTION EXCEPTION

The FTCA provides a limited waiver of sovereign immunity that "allows plaintiffs to

seek damages from the United States for certain torts committed by federal employees," but also

sets out statutory exceptions to this waiver applicable "to certain categories of claims."  *Simmons

v. Himmelreich*, 136 S. Ct. 1843, 1843–44 (2016).  "If one of those exceptions applies, the court

lacks subject-matter jurisdiction to hear the plaintiff's claims."  *Loumiet v. United States*, 828

F.3d 935, 941 (D.C. Cir. 2016) (internal citation omitted); *Sledge v. Fed. Bureau Prisons*, 2013

U.S. App. LEXIS 25940 (D.C. Cir. Jan. 15, 2013) (noting that the D.C. Circuit "treat[s] the

exception as jurisdictional.").

As recounted by the Supreme Court, the legislative history of the FTCA indicates that

this law "was the offspring of a feeling that the Government should assume the obligation to pay

damages for the misfeasance of employees in carrying out its work," and to simplify the

alternative method of "the private bill device," which spawned thousands of such bills prior to

the FTCA's enactment.  *Dalehite v. United States*, 346 U.S. 15, 24–25 (1953); *see also American

Stevedores, Inc. v. Porello*, 330 U.S. 446, 453 (1947) (observing that passage of FTCA "attests to

the growing feeling of Congress that the United States should put aside its sovereign armor in

cases where federal employees have tortiously caused personal injury or property damage.").

---

[4]     The plaintiff has requested "an oral hearing in opposition to" the pending motion to dismiss, Pl.'s Request
for Oral Hearing, ECF No. 18, but given the sufficiency of the written submissions, this request is denied.  *See*
D.D.C. Local Civil Rule 7(f) (stating that allowance of oral hearing "shall be within the discretion of the Court").

"Uppermost in the collective mind of Congress were the ordinary common-law torts." *Dalehite,* at 28.[5]  At the same time, Congress wished to avoid authorizing tort lawsuits for money damages against the United States arising from "legally authorized activity" as a means to test "'the constitutionality of legislation, the legality of regulations, or the propriety of a discretionary administrative act.'"  *Id.* at 27 (quoting Assistant Attorney General appearing before House Committee on the Judiciary, 77th Cong., 2d Sess., on H. R. 5373 and H. R. 6463, pp. 25, 33); *see also id.* at 27–28 ("The legislative history indicates that while Congress desired to waive the Government's immunity from actions for injuries to person and property occasioned by the tortious conduct of its agents acting within their scope of business, it was not contemplated that the Government should be subject to liability arising from acts of a governmental nature or function.").

To this end, the FTCA included the discretionary function exception, which excludes from the sovereign immunity waiver any claim "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or

---

[5]        With passage of the FTCA, Congress, in effect, required the government to be a good neighbor, generally subject to employing the same standard of care generally applicable in the community.  *See* 28 U.S.C.S. § 1346(b) ("The United States is liable for tortious conduct "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."). Otherwise, communities would be rightly concerned about non-compensable risk from neighboring federal lands. This principle is reflected in *Husovsky v. United States,* 590 F.2d 944 (D.C. Cir. 1978), where the D.C. Circuit affirmed the jury verdict of negligence against the United States for injuries caused to the plaintiff when a tree branch weighing an estimated ten tons fell on his car while the plaintiff was driving on Klingle Road in the Klingle Valley area of Rock Creek Park, the same park area where the falling tree branch hit the plaintiff in this case.  *Id.* at 947-48.  The D.C. Circuit highlighted the "uniqueness" of Rock Creek Park "in being natural woodland situated in the midst of an urban area," *id.* at 950–51, and that "the Klingle Valley portion of the Park in particular," where the Connecticut Avenue Bridge is located, is not "isolated from the urban area surrounding it," but rather "is crisscrossed with well traveled thoroughfares, [which] invites commuters and other travelers to utilize the road as they would any other limited access artery," *id.* at 951.  Due to the "obvious" "potential dangers inherent in a situation . . . where dense woods are proximate to a well travelled thoroughfare," *id.* at 952, the *Husovsky* Court stressed the duty of the owner or occupant of land "to use reasonable care to protect passers-by on adjoining public ways from hazardous trees on his land," *id.* at 953, which duty obliged the District of Columbia and the federal government, as any other landowner, "to use reasonable diligence to protect [the public] on Klingle Road from hazards posed by the land," *id.* at 953.  The United States did not raise the discretionary function exception in *Husovsky,* despite citing in pretrial briefing and the briefs on appeal, *see* Federal Gov't's Mem Supp. Mot. Dismiss at 2, *Husovsky v. United States,* No. 69-cv-3155 (D.D.C. October 30, 1972); Appellant United States Br. at 24, *Husovsky v. United States,* Nos. 76-1533 & 76-1534 (D.C. Cir. 1977), to both *Dalehite,* the then-seminal Supreme Court case on this exception*,* and other FTCA provisions, and thus the scope of this exception was not considered.

an employee of the Government, whether or not the discretion involved be abused."  28 U.S.C. §

2680(a).  Thus, the discretionary function exception "marks the boundary between Congress'

willingness to impose tort liability upon the United States and its desire to protect certain

governmental activities from exposure to suit by private individuals," *United States v. Varig

Airlines*, 467 U.S. 797, 808 (1984), thereby serving to "'prevent judicial second-guessing of

legislative and administrative decisions grounded in social, economic, and political policy

through the medium of an action in tort,'" *Loumiet*, 828 F.3d at 941 (quoting *Varig Airlines*, 467

U.S. at 814).

Since the FTCA was passed in 1946, the Supreme Court has articulated and refined a

two-part test to determine whether a claim falls within the discretionary function exception.  *See

United States v. Gaubert*, 499 U.S. 315 (1991); *Berkovitz v. United States*, 486 U.S. 531 (1988);

*Varig Airlines*, 467 U.S. at 797.  Under this well-established framework for determining the

applicability of the discretionary function exception, a court asks, first, whether the challenged

actions "are discretionary in nature" and "involve an element of judgment or choice," *Gauber*t,

499 U.S. at 322 (quoting *Berkovitz*, 486 U.S. at 536; citing *Dalehite* 346 U.S. at 34); and, if so,

second, "whether that [conduct] is of the kind that the discretionary function exception was

designed to shield," *Gaubert*, 499 U.S. at 322–23 (quoting *Berkovitz*, 486 U.S. at 536; citing

*Varig Airlines*, 467 U.S. at 813); *see also Loumiet*, 828 F.3d at 942 ("[I]f the conduct does

involve some element of judgment or choice, we must ask . . . whether the actions or decisions

'were within the range of choice accorded by federal policy and law and were the results of

policy determinations'") (quoting *Berkovitz*, 486 U.S. at 538); *Loughlin v. United States*, 393

F.3d 155, 163 (D.C. Cir. 2004) (same); *Cope v. Scott*, 45 F.3d 445, 448 (D.C. Cir. 1995) (same).

With respect to the first prong of the test, challenged conduct is not discretionary if a

"federal statute, regulation, or policy specifically prescribes a course of action for an employee to

follow." *Berkovitz*, 486 U.S. at 536.  In that instance, "the employee has no rightful option but to adhere to the directive," barring any claim of an exercise of discretion.  *Id.*.  Consequently, "there will be no shelter from liability because there is no room for choice and the action will be contrary to policy."  *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1143 (D.C. Cir. 2015) (citing *Gaubert*, 499 U.S. at 324); *see also Loumiet*, 828 F.3d at 941–42 (noting that discretionary function exception "does not apply to a claim that an agency failed to "perform its clear duty" or to "act in accord with a specific mandatory directive" (quoting *Berkovitz*, 486 U.S. at 545)); *Loughlin*, 393 F.3d at 163 (instructing that if "a binding directive exists, then the employee has no rightful option but to adhere" (internal quotations omitted)).

The D.C. Circuit has described a "discretionary" function shielded by sovereign immunity as "involv[ing] judgment, planning, or policy decisions," as distinguished from "ministerial functions," which are "not discretionary" and "involve[] enforcement or administration of a mandatory duty at the operational level, even if professional expert evaluation is required.'" *KiSKA Constr. Corp., U.S.A. v. Wash. Metro. Area Transit Auth.*, 321 F.3d 1151, 1159, n.9 (D.C. Cir. 2003) (evaluating tort liability of quasi-governmental entity using "two-part test culled from the FTCA's 'discretionary function' jurisprudence") (quoting *Beatty v. Washington Metropolitan Area Transit Authority*, 860 F.2d 1117, 1127 (D.C. Cir. 1988) (quoting *Jackson v. Kelly*, 557 F.2d 735, 737–38 (10th Cir. 1977)); *see also Beebe v. Washington Metro. Area Transit Auth.*, 129 F.3d 1283, 1287 (D.C. Cir. 1997) (noting that "the immunity question often turns on whether the activity is 'discretionary' or 'ministerial,' a dichotomy employed by the Federal Tort Claims Act.").

With respect to the second prong of the test, conduct is within the intended scope of the discretionary function exception that Congress intended to protect when the act is "susceptible to policy judgment," *Banneker Ventures*, 798 F.3d at 1139, or is an exercise of "political, social,

[or] economic judgment," *Cope*, 45 F.3d at 448 (citing *Gaubert*, 499 U.S. at 325), involving, for example, decisions that are "grounded in the policy of the regulatory regime," *Sloan v. U.S. Dep't of Hous. & Urban Dev.*, 236 F.3d 756, 761 (D.C. Cir. 2001) (quoting *Gaubert*, 499 U.S. at 325). While the conduct need not be "confined to the policy or planning level," *Gaubert*, 499 U.S. at 325, this exception does not shield conduct that requires simple "garden-variety" decisions, such as the everyday, split-second choice a government employee makes while operating a vehicle, *see Cope*, 45 F.3d at 448 (citing *Gaubert*, 499 U.S. at 332), or those acts outside the mission of the agency responsible for the challenged action, *see Loumiet*, 828 F.3d at 940 (noting that conduct, which "cannot be said to be based on the purposes that the regulatory regime seeks to accomplish," is not covered by the exception). The Supreme Court has stressed that "it is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case." *Varig Airlines*, 467 U.S. at 813; *see also Marlys Bear Medicine v. United States*, 241 F.3d 1208, 1213 (9th Cir. 2001) ("[W]here the government is alleged to have committed negligence in the performance of a function such as that performed by a private citizen, rather than in the fulfillment of a broad policy-making duty, the government is subject to suit." (citation omitted)); *Maalouf v. Swiss Confederation*, 208 F. Supp. 2d 31, 36 (D.D.C. 2002) (holding Swiss Embassy was not protected by sovereign immunity for decisions as to maintenance of the Embassy's grounds because such decisions were made in its capacity as a land owner, not in its capacity as an diplomatic mission).

### B.  THE GOVERNMENT FAILS BOTH PRONGS OF THE BERKOVITZ TEST.

The government argues that the discretionary function exception divests this Court of subject matter jurisdiction because, first, no particular course of action is mandated by the regulations and policies governing Rock Creek Park, and second, that any discretionary actions taken by the government are based on important policy judgments made by the NPS. Gov't's

Mem. at 11-13. [6]  As discussed below, the government's arguments fail because relevant federal regulations and policy cited by the government prescribe mandatory conduct for the maintenance, inspection and record-keeping for trees in Rock Creek Park, and further, to the extent such actions are discretionary, implementation requires the application of scientific and professional judgment, not the weighing of policy factors underlying the discretionary function exception.

The Court now turns to application of the *Berkovitz* test to the plaintiff's negligence claim against the United States, starting with the first prong: whether the challenged conduct of inspecting, maintaining and keeping records about Rock Creek Park trees lining the Connecticut Avenue Bridge, is discretionary in nature, as the government urges.

### 1. The Governing Manual Mandates Specific Conduct

The government argues that "Rock Creek Park's . . . management of potentially hazardous trees within the park [is] not subject to any prescribed mandate or course of action." Gov't's Mem. at 12.  In support, the government provides a declaration from a former Rock

---

[6]    The parties dispute which side bears the burden of proving whether the discretionary function exception applies. Pl.'s Opp'n at 2-3; Gov't's Reply at 1-4.  The law is well-established that the plaintiff bears the burden of proving an unequivocal waiver of sovereign immunity, but "it is less clear whether the plaintiff or the government bears the burden of proof to show whether a discretionary function exception to a waiver of sovereign immunity applies."  *St. Tammany Par., ex rel. Davis v. Fed. Emergency Mgmt. Agency*, 556 F.3d 307, 315 n.3 (5th Cir. 2009). The D.C. Circuit has not opined on this issue, and other circuits have divided authority, with the majority holding that the government must establish that the discretionary function exception applies.  *Compare Welch v. United States*, 409 F.3d 646, 651 (4th Cir. 2005) (holding that "it is the plaintiff's burden to show that an unequivocal waiver of sovereign immunity exists and that none of the statute's waiver exceptions apply to his particular claim"); *Aragon v. United States*, 146 F.3d 819, 823 (10th Cir. 1998) (holding that plaintiff must prove that no exception applies), *with Merando v. United States*, 517 F.3d 160, 164 (3d Cir. 2008) (holding that "[t]he United States has the burden of proving the applicability of the discretionary function exception"); *Terbush v. United States*, 516 F.3d 1125, 1128 (9th Cir. 2008) (same); *Stewart v. United States*, 199 F.2d 517, 520 (7th Cir. 1952) (same); *see also* 14 CHARLES A. WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE & PROCEDURE § 3658.1 at 369 (3rd ed. 1998) ("Although the Plaintiff bears the initial burden of proving jurisdiction under the Federal Tort Claims Act, most courts have concluded that the applicability of the discretionary function exception falls upon the United States.").  Other circuits have adopted alternative approaches.  *See, e.g.*, *Ochran v. United States*, 117 F.3d 495, 504 n. 4 (11th Cir. 1997) (declining to resolve the issue of which party bears the burden, but placing the "burden of production of the policy considerations that might influence the challenged conduct . . . on the Government," after the plaintiff alleged facts facially placing the claims outside of the exception).  This dispute need not be resolved for this motion, since the plaintiff has adequately demonstrated that the discretionary function does not bar her claims. *See infra* II.B.1 & 2.

Creek Park supervisory horticulturalist, who acknowledges that the "NPS expressly recognizes that safety concerns must be balanced against the interest of 'preservation of the protected natural, historic, or cultural setting.'"  Gov't's Mot. Ex 3, Decl. of Diana Bramble, Former Rock Creek Park Supervisory Horticulturalist ("Bramble Decl."), ¶¶ 10–11, ECF No. 14-3 (citing NPS Director's Order 50C).  At the same time, the declarant opines that, in addressing such safety concerns, "specific activities relating to tree management and the identification and mitigation of tree hazards are not mandated by any statute, regulation, or NPS policy, but are left to each park for tailoring and execution to the park's specific needs."  *Id.* at ¶ 12.

The NPS declarant cites the following four excerpted documents submitted by the government as evidence that "the means by which public safety concerns are to be met is left to the discretion of the superintendents and other decision makers at the park level," *id.* at ¶ 10 (quoting NPS Management Policies at Ch. 8.2.5):  (1) a "National Park Service Management Policies 2006" handbook ("2006 NPS Management Policies"), Gov't's Mot., Ex A, ECF No. 14-4, which provides general guidance applicable to all national parks; (2) NPS "Director's Order #50C: Public Risk Management Program ("Order 50C"), Gov't's Mot., Ex. B, ECF No. 14-5, which is an order issued, on May 7, 2010, by the NPS director providing guidance on a recommended risk management program generally applicable to all national parks; (3) the "National Resources Management Guideline NPS-77" ("NPS-77"), Gov't's Mot., Ex. D, ECF No. 14-7, which is an undated NPS guidance document concerning natural resource management; and (4) the NPS "Tree Management Action Plan" for Rock Creek Park, dated "Draft 9-21-2011" ("Draft Tree Plan"), Gov't's Mot., Ex. C, ECF No. 14-6, which outlines specific policies applicable to Rock Creek Park.  In the government's view, these documents "clearly delegated park discretion" to determine "in the course of inspections, which trees warrant additional inspection or remedial activity," Gov't's Reply at 9, and, consequently, that

"no mandatory course of action controls how Rock Creek Park staff must identify and manage hazardous trees," *id*. at 6.

The government is correct that the excerpts provided from three of the government's submitted documents—the 2006 Management Policies, Order 50C, and NPS-77—largely "leave public safety determinations to the discretion of each national park." Gov't Mem. at 12. For example, the 2006 Management Policies states that "[t]hese management policies do not impose park-specific visitor safety prescriptions. The means by which public safety concerns are to be addressed is left to the discretion of superintendents and other decision-makers at the park level who must work within the limits of funding and staffing." 2006 Management Policies at §8.2.5.1. The NPS Order 50C similarly reserves to superintendents "discretion to determine the level of program resources and the types of programs needed to manage visitor risk . . . depend[ing] on the resources, values, park-specific mission, feasibility of various program levels, activities offered within the park, the history of visitor injury in the park, and available resources." Order 50C at 11. Finally, NPS-77 requires that a park "must seek to implement a [hazardous tree program] that will reasonably protect visitors from unnecessary risks resulting from hazardous trees," NPS-77 at 350, while noting "the inherent decision-making challenge in addressing hazardous trees," citing the need to evaluate "the tree as a functional and aesthetic component of the landscape, in addition to its potential hazard," *id*.

By contrast to those three general guidance documents, the Draft Tree Plan outlines the specific policies and practices applicable to Rock Creek Park. Contrary to the government's contention, the Draft Tree Plan, in fact, mandates that certain actions be taken by Park staff. Regarding recordkeeping, the Draft Tree Plan mandates that "[i]nspections and corrective actions *shall* be documented," and that "[a] tree removal log shall be maintained that delineates removals in developed/managed versus natural areas." Draft Tree Plan at 3 (emphasis added). Regarding

inspection and maintenance, the Plan further mandates a number of specific actions, by requiring that a "monthly inspection *shall* be conducted for all primary roads" within the Park, *id*. at 2 (emphasis added); that "[a]dditional inspections in these areas *shall* be conducted after storms and other severe weather events, *id*. (emphasis added); that "walk through bi-annual inspections . . . *shall* be conducted in all other areas where there is potential for a structure, resource or person to be impacted by a falling tree or tree part," *id.* (emphasis added); and that "[a]ll workmanship [performed in the maintenance of trees] *shall* be in accordance in accordance [sic] with NPS policies, management guidelines and Industry Standards[,] specifically: (a) ANSI-A300 Tree Care Operations – Standard Practices [and] (b) ANSI-Z113 – Arboricultural Operations – Pruning, Repairing, and Maintaining . . . .," *id*. at 3 (emphasis added).[7]  The manner in which inspections are conducted "*shall* include" certain steps, depending on whether the inspection is of an individual tree, a walk through or a "[drive-by or windshield." *Id*. (emphasis added).

The language of these mandates for record-keeping, inspection and maintenance of the trees in Rock Creek Park "prescribes a course of action for an employee to follow." *Berkovitz*, 486 U.S. at 536.  NPS staff is mandated to conduct monthly inspections of trees on a primary road, bi-annual inspection of trees that pose a risk to the public, and comply with specific industry standards for tree care.  NPS staff is also mandated to document "[i]nspections and corrective actions taken," as well as keep other records.  These clear mandates remove the immunity shield provided by the discretionary function exception in the FTCA.  *Loughlin*, 393 F.3d at 163 (noting if "a binding directive exists, then the employee has no rightful option but to adhere to the directive"); *see also Snider v. Sterling Airways, Inc*., Civil Action No. 13-CV-2949, 2016 U.S. Dist. LEXIS 103060, 16–19 (E.D. Pa. Aug. 3, 2016) (denying motion of United States to dismiss negligence claim arising from aircraft crash for lack of subject matter jurisdiction,

---

[7]     The industry standards referenced in the Draft Tree Plan have not been submitted as part of the record.

upon finding that federal employees "were 'required' to undertake and had the 'responsibility' to, *inter alia*, inspect" operation, and "[t]his language… strongly evinces that the said employees had no discretion or choice as to whether or not to engage in such activities," such that "the discretionary function exception has no application").

Notwithstanding the clear language of the mandates in the Draft Tree Plan, the government makes two arguments in support of its position that Park staff is actually not subject to any "binding directive," but instead enjoys discretionary authority regarding tree management in Rock Creek Park such that the first prong of the discretionary function test is met.  First, the government contends that the Draft Tree Plan only "requires *when* tree inspections [are to] be performed" and "does not mandate, in any way whatsoever, what conditions or defects the park's tree staff must measure or identify."  Gov't's Reply at 8 (emphasis in original).  In the government's view, then, "the Tree Plan provides no mandatory course of action that the park's tree staff must abide by in determining whether trees should be addressed or removed during the course of an inspection."  *Id.*  The thrust of the government's word-parsing appears to draw a distinction between the mandated timing of inspections and any mandated course of action thereafter.  Since mandated inspections would be sufficient in light of the nature of the challenged inspection conduct at issue to fall outside the exception, this distinction does not appear to be material to the application of the discretionary function exception here.  *See* Pl.'s Opp'n at 6 (noting that "[b]ecause the government conduct that allegedly caused Ms. Walen's injuries was controlled by mandatory directives of the Tree Plan controlling Rock Creek Park, it did not arise out of a discretionary function.").

In any event, the government is incorrect about the extent of discretion NPS staff has to address tree maintenance issues that are revealed by a mandated inspection.  The Draft Tree Plan incorporates by reference a number of written "industry standards" regarding maintenance of

trees in Rock Creek Park.  *See* Draft Tree Plan at 3 (requiring that "all workmanship *shall* be in

accordance with" various ANSI and other standards) (emphasis added).  Given that these

standards "shall" be followed with regards to tree inspection and maintenance, the government's

gloss on the Draft Tree plan as "not mandat[ing], in any way whatsoever" actions that staff

should take, is not actually reflected in the documents submitted by the government.  Gov't's

Reply at 8.  Instead, the Draft Tree Plan requires compliance with binding requirements and

standards to control inspection and maintenance of trees in Rock Creek Park.

 Second, the government contends that, even if the Draft Tree Plan imposes mandates for

tree management in Rock Creek Park, these requirements should be viewed merely as

implementing broader discretionary policies articulated by the NPS.  Gov't's Reply at 6–9

(urging that focus should be on "whether the controlling statutes, regulations, and administrative

policies mandate that the Park Service locate and manage hazardous trees in any specific

manner.").  The government, in effect, seeks to shift evaluation of the discretionary or mandated

nature of the tree management in Rock Creek Park from the specific requirements of the Draft

Tree Plan to the broader policies articulated by NPS in guidelines generally applicable to all NPS

parks, whether in wilderness or urban areas, as reflected in the three other documents submitted

by the government.  *See* Gov't's Reply at 7 (noting "that NPS's delegated discretion begins with

the NPS Organic Act, 16 U.S.C. § 1, and flows through the NPS Management Policies,

Director's Order 50C and Natural Resource Management Guidelines, and Rock Creek

Management Plan").  Viewed through the lens of these broader NPS guidelines, the government

posits that the specific inspection regime adopted in the Draft Tree Plan merely amounts to "an

inspection regime [that] has been held to fall squarely within the discretionary function

exception."  Gov't's Reply at 8.

The government's argument stretches the scope of the discretionary function exception too far and would effectively immunize any work-related conduct by federal employees, no matter how ministerial the task carried out by the employee.  The cases relied upon by the government for the broad proposition that inspection regimes are discretionary, no matter how rigorous the compliance requirements or mandates, because the agency "elect[s]" to adopt them, Gov't's Reply at 9, simply do not support this broad view of the discretionary function exception.  The Supreme Court's reasoning in *Dalehite* makes the overbreadth of the government's proffered construction of the discretionary function exception clear.

The *Dalehite* Court concluded that the discretionary function exception barred negligence claims against the United States arising from explosions caused by fertilizer, which was prepared under government specifications using a known explosive ingredient, as part of a comprehensive federal program.  346 U.S. at 23–24.[8]  Noting that the exception immunizes conduct involving "the discretion of the executive or the administrator to act according to one's judgment of the best course," *id*. at 34, the Supreme Court observed that the exception covers "more than the initiation of programs and activities [and] also includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations," such that "acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable," *id*. at 35–36.  Since the acts of both high-level policy-makers as well as their subordinates were shielded to the extent that, at each level, discretion was exercised to fulfill the program objectives, the Court closely examined "the specific acts of negligence charged in the manufacture" of the fertilizer.  *Id*. at 38.  The Court concluded that the negligence

---

[8]    Following the *Dalehite* decision barring the negligence suits, "the facts of the Texas City catastrophe were presented to Congress," which "ultimately enacted a bill granting compensation to the victims in question" without "any effort made to modify this Court's construction of the Tort Claims Act in *Dalehite*."  *Laird v. Nelms*, 406 U.S. 797, 802 (1972).

claims were barred since each step was "the product of an exercise of judgment, requiring consideration of a vast spectrum of factors, including some which touched directly the feasibility of the fertilizer export program," *id*. at 40, 42 (finding that "[t]he decisions held culpable were all responsibly made at a planning rather than operational level and involved considerations more or less important to the practicability of the Government's fertilizer program.").[9]  The teaching of *Dalehite* is that the discretionary function exception bars suit against the United States when the challenged conduct actually involved discretionary decisions to effectuate a government program, no matter the rank of the government actor, whether high-level government administrators or their subordinates.

Likewise, in *Varig Airlines*, on which the government relies, Gov't's Mem. at 10; Gov't's Reply at 8, the Supreme Court held that the discretionary function exception barred suits arising from fatal accidents caused by airplane malfunctions when the claims challenged "the FAA's decision to implement" a "spot-check" system of compliance certification to enforce minimum safety standards, as well as "the application of that 'spot-check' system to the particular aircraft involved in [those] cases."  467 U.S. at 819.  Recognizing that "Congress specifically empowered the Secretary to establish and implement a mechanism for enforcing compliance with minimum safety standards according to her judgment of the best course," *id.* at 816, the Court found that "[t]he FAA's implementation of a mechanism for compliance review is plainly

---

[9]      The D.C. Circuit observed that "[a]fter initial confusion following the Supreme Court's broad construction of the exception in *Dalehite* [] many courts, including our own, accepted a distinction based upon language in that case to the effect that 'operational' duties as opposed to 'planning' duties did not fall within the exception, even though the former inevitably required judgment and discretion."  *Sami v. United States*, 617 F.2d 755, 765 (D.C. Cir. 1979), *overruled on other grounds sub nom*, *Sosa v. Alvarez-Machain*, 542 U.S. 692, 697 (2004).  Notwithstanding this now discarded analytical distinction between operational and planning duties, *see Gaubert*, 499 U.S. at 326, the *Sami* Court highlighted the real focus of the analysis as one of the "persistent themes, *e.g.,* holding the government responsible for any negligent execution of admittedly discretionary policy judgments where the decisions required for the execution did not themselves involve the balancing of public policy factors," *id*. at 766 (citing *Blessing v. United States*, 447 F. Supp. 1160, 1179–80 n.28, (E.D.Pa.1978)), which presciently articulates the second prong of the *Berkovitz* test.

discretionary activity," *id*. at 819.  In addition to that top-level decision, the Court further concluded that "the acts of FAA employees in executing the 'spot-check' program, in accordance with agency directives are protected by the discretionary function exception as well."  *Id.* at 820. This latter conclusion was predicated on an assessment of the discretionary authority granted by governing regulations to these employees, who "were specifically empowered to make policy judgments" and "calculated risks… for the advancement of a governmental purpose," such that their "alleged negligence in failing to check certain specific items in the course of certificating a particular aircraft falls squarely within the discretionary function exception. . . ." *Id.*[10]  In other words, the challenged conduct was not merely the performance of ministerial acts prescribed by regulation but rather was activity imbued with discretionary authority all the way down the chain of the program's implementation to the line inspectors conducting the "spot-checks."

Thus, both *Dalehite* and *Varig Airlines* stand for the proposition that the execution of a government program, including for inspections, is only discretionary to the extent that the inspection itself involves policy judgments, and undercuts the government's broader view that any activity performed in furtherance of a federal inspection program is cloaked by sovereign immunity.  In fact, the D.C. Circuit, in *Cope,* 45 F.3d at 449, rejected a similar government "effort to expand the exception too far," and found that "[t]he mere presence of choice—even if that choice involves whether money should be spent—does not trigger the exception."  At the same time, the *Cope* Court likewise rejected the plaintiff's argument "that the government's acts are not discretionary" when "they involve the implementation of government policy," *id.* (internal quotations omitted), reiterating that the correct inquiry is "[w]hether the nature of the decision involved the exercise of policy judgment," regardless of "the level at which the decision was made, the nature of the decision, or the impact it had on others," *id.* at 449–50.  Notably, in

---

[10]        The two-prong test was not expressly articulated in *Varig Airlines* but the *Berkovitz* Court specifically discussed *Varig Airlines* as a case that "illustrated" the application of this test.  *Berkovitz*, 486 U.S. at 537–38.

evaluating the application of the discretionary function exception to the plaintiff's claim of negligent maintenance of a Rock Creek Park road heavily used by commuters, the *Cope* Court closely examined a guidance manual regarding maintenance of the road.  The court found that the manual did not set out "specific prescriptions," but rather provided standards "applicable only to the extent practicable," a "caveat" that allowed "flexibility" in the face of "competing priorities," which "is the essence of discretion."  *Id*. at 450.  Further finding that this discretion was subject to policy analysis, the Court concluded that the discretionary function exception barred the plaintiff's claim of negligent maintenance of the road.[11]

By contrast to the guidance manual examined in *Cope*, the Draft Tree Plan at issue here contains no similar "caveat" allowing flexibility, but clear, direct prescriptions regarding tree inspection and maintenance, as well as record-keeping of these activities.[12]  Consequently, under

---

[11]      The *Cope* Court "reach[ed] a different conclusion with respect to [the plaintiff's] allegation that the government failed to post adequate warning signs about the nature of the road surface," 45 F. 3d at 451, which road was "a commuter route through an urban park," *id*. at 452. While finding, again, that the applicable manual regarding signage was "more of a guidebook…than a 'specific prescription'" and consequently, "involve[d] the exercise of discretion," the court nevertheless concluded, in applying the second prong of the *Berkovitz* test, that the "engineering judgment" required was not "fraught with public policy considerations" but only "objective scientific principles" that were distinguishable from "exempt exercises of policy judgement." *Id*. at 451–52.

[12]      The government relies on seven non-binding, out-of-circuit cases that barred negligence actions arising from injuries caused by falling trees in federal parks, as support for its view that "management of tree hazards" is a "discretionary and policy-based activity" shielded "by operation of the discretionary function exception." Gov't's Mem. at 11-12; Gov't's Reply at 8.  Yet, those cases are distinguishable on at least two related grounds: first, none of those cases involved, as here, a park in an urban environment, with concomitant safety concerns for heavy commuter or pedestrian traffic; and, second, the specific policies governing the parks at issue –likely due in part to their non-urban location —granted express or otherwise clear discretionary authority for tree management.  For example, in *Merando v. United States*, 517 F.3d 160, 170, 172 (3d Cir. 2008), the court held that the discretionary function exception barred suit for a fatal injury caused by a falling tree in the 63,000 acre, "primarily . . . forested" Delaware Water Gap National Recreation Area, since the NPS tree plan governing tree management for that park "did not mandate any particular method of hazardous tree management," by contrast to the Draft Tree Plan, which mandates compliance with various ANSI standards.  Similarly, in *Hatcher v. United States*, 512 F. App'x 527, 530 (6th Cir. 2013), a negligence lawsuit brought by a plaintiff injured by a falling tree in Great Smoky Mountains National Park was barred by the discretionary function exception after the court found that governing guidelines were "discretionary because they allow Park employees executing them to determine how to best implement the overall framework considering various factors."  Likewise, in *Moyer v. Wash. State*, No. 95-35858, 1997 U.S. App. LEXIS 893, at *3–4 (9th Cir. Jan. 17, 1997), the discretionary function exception barred suit by plaintiffs, whose children were killed by a falling tree in the Mt. Baker-Snoqualmie National Forest, since no guidelines "direct[ed] the Forest Service to identify and remove hazardous trees" on the road at issue and maintenance on the road where the accident occurred was, in any event, the responsibility of state authorities.  In *Autery v. United States*, 992 F.2d 1523, 1528–29 (11th Cir. 1993), the discretionary function exception barred a negligence lawsuit arising from a fatal injury from two falling trees in the Great Smokey Mountain National Park since the NPS plan for the park "did not compel park employees to inspect certain trees on certain days or remove a particular number of trees per week," in

the guidance of *Dalehite*, *Varig Airlines* and *Cope*, the lack of discretion involved in execution

of these Draft Tree Plan requirements means that the first-prong of the *Berkowitz* test is not met

and the discretionary function exception does not bar the plaintiff's suit.

### 2. Even if Discretionary, NPS's Challenged Tree Management Decisions Are Not Susceptible to Policy Analysis

Even assuming that the government's actions in implementing the Draft Tree Plan were

discretionary, the challenged actions would nonetheless fail the second prong of the *Berkovitz*

test, since the challenged conduct is not "the kind [of action] that the discretionary function

exception was designed to shield." *Gaubert*, 499 U.S. at 332. The government argues that

decisions made about the management of the trees bordering the Connecticut Avenue Bridge

involve "the balancing of important public policy considerations," Gov't Mem. at 12, "public

safety," Gov't Reply at 9, "the aesthetics of Rock Creek Park, the ecology of Rock Creek Park,

and the economic benefit of Rock Creek Park to the District of Columbia," Gov't Mem. at 12,

bolstering the conclusion that tree management "fall[s] squarely within NPS's mission of natural

resource preservation." *Id.* The government's argument fails for at least two reasons.

First, tree maintenance and inspection in Rock Creek Park does not involve the types of

decisions the discretionary function exception was meant to protect. "[N]ot all actions that

require choice—actions that are, in one sense, 'discretionary'—are protected as 'discretionary

functions' under the FTCA," *Cope*, 45 F.3d at 448, "[t]he mere association of a decision with

---

contrast to the Draft Tree Plan, which contains a mandated schedule for inspections and prescribes standards for tree management. *See also* Gov't Mem. at 12 (citing *Schroller v. United States*, No. 11-7719, 2013 U.S. Dist. LEXIS 105514, at *13–14 (E.D. Pa. July 26, 2013) (discretionary function exception barred suit by plaintiff injured by a falling tree in Valley Forge National Park, which had no written tree management plan, and depositions of NPS employees made it "clear that the inspection plan in effect at the time of the accident did not compel Park Service employees to inspect certain trees on certain days or remove certain trees according to any timeline"); *Moon v. United States*, No. CV-06-0328-EFS, 2008 U.S. Dist. LEXIS 60676, at *11 (E.D. Wash. Aug. 4, 2008) (discretionary function exception barred suit by plaintiff injured by a falling tree in Glacier National Park, which was governed by NPS policies with specific language "afford[ing] broad discretion for Glacier officials"); and *Wright v. United States*, 868 F. Supp. 930, 934 (E.D. Tenn. 1994) (discretionary function exception barred suit by plaintiffs injured by a falling tree in a wilderness area in Nantahala National Forest, when the applicable guidelines "allowed the maximum discretion by the employees of the Forest Service"). In short, all seven of the cases relied upon by the government are inapposite.

regulator concerns is not enough," *id.* at 449.  The discretionary function exception "only protects decisions that are 'fraught with . . . public policy considerations." *Wesberry v. United States*, 2016 U.S. Dist. LEXIS 121967, at *19 (D.D.C. Sept. 9, 2016) (quoting *Sami*, 617 F.2d at 767).  Indeed, the Supreme Court has recognized that just because a federal employee exercises some judgment in carrying out his or her responsibilities is not dispositive for application of the discretionary function exception; otherwise the exception would swallow the general rule permitting tort suits against the government.  *Gaubert*, 499 U.S. at 325 n.7 (recognizing that "[t]here are obviously discretionary acts performed by a Government agent that are within the scope of his employment but not within the discretionary function exception because these acts cannot be said to be based on the purposes that the regulatory regime seeks to accomplish.").  In other words, the fact that some amount of discretion is involved in a decision does not necessarily insulate it from review.  *See Bultema v. United States*, 359 F.3d 379, 383 (6th Cir. 2004) (explaining that an "act does not necessarily amount to an exercise of a discretionary function merely because carrying out the general policy provided the opportunity for the negligent act.").

"[S]ince nearly every government action is, at least to some extent, subject to 'policy analysis,'" *Cope*, 45 F.3d at 448 (quoting *Gaubert*, 499 U.S. at 336), "[t]he precise contours of this test are difficult to pin down," *Sledge*, No. 12-5287, 2013 U.S. App. LEXIS 25940, at *6. Given the plain language of the mandates in the Draft Tree Plan for the management of the trees in Rock Creek Part, to the extent that Park staff retain any discretion in the implementation of the governing regulations, the exercise of that discretion involves the application of scientific standards and expert judgments, which unlike the weighing of policy considerations, are not protected by the discretionary function exception.

The Supreme Court has drawn a distinction between "the application of objective scientific standards" and the exercise of "considerable policy judgment," with only the latter types of governmental conduct shielded by the discretionary function exception. *Berkovitz*, 486 U.S. at 545; *see also Macharia v. United States*, 334 F.3d 61, 67 (D.C. Cir. 2003) ("What matters is … whether the type of decision being challenged is grounded in social, economic, or political policy."). Applications of scientific and professional judgment do not require "balancing the same considerations that inform all policy decisions regarding the management of national parks: safety, aesthetics, environmental impact, and available financial resources." *Autery*, 992 F.2d at 1530. Thus, actions "based on technical or scientific standards are not the kind of judgments meant to be protected from liability by the discretionary function exception because those actions do not involve a weighing of policy considerations." *Marlys Bear Medicine*, 241 F.3d at 1214; *see also Van Orden v. United States*, No. 94-16199, 1996 U.S. App. LEXIS 12646, at *5 (9th Cir. May 15, 1996) (noting that decisions that are based "solely on technical considerations" do not require an employee "to balance social, economic, and political considerations"); *Bolt v. United States*, 509 F.3d 1028, 1034 (9th Cir. 2007) ("[M]aintenance work is not the kind of regulatory activity to which the Supreme Court envisioned the discretionary function exception applying.").

The NPS's mission indisputably concerns the preservation of natural resources, *see* 54 U.S.C. § 100101, a mission that must be balanced "against the interests of public safety," Gov't's Reply at 9-10. Yet, in urging that this over-arching mission dictates the outcome of the discretionary function exception here, the government fails to acknowledge that ministerial actions involving the application of ANSI's standards for tree management differ from broader policy concerns underlying the adoption of regulations specific to Rock Creek Park. Simply put, determining whether a tree is structurally sound or poses a risk to pedestrians in a heavily

traveled thoroughfare are not the kind of discretionary judgments that Congress intended to immunize.  Here, the plaintiff's complaint challenges the exercise of professional and scientific assessments of the Park's trees lining the Connecticut Avenue Bridge, which assessments were supposed to be conducted pursuant to NPS's prior policy choice to adopt the Draft Tree Plan, and does not implicate NPS's policymaking regarding the balancing of competing considerations in preserving the Park while protecting public safety.  Thus, as in other cases involving a federal agency's application of scientific or expert professional judgment in carrying out ministerial tasks, the challenged conduct falls outside the scope of the discretionary function exception.  *See, e.g.*, *Fernandez v. United States*, 496 F. App'x. 704, 706 (9th Cir. Or. 2012) (finding that the "district court erred in dismissing this suit for lack of subject matter jurisdiction" because "[t]he government [failed] to meet the second prong of the *Berkovitz* test because the removal of a previously identified dangerous tree is merely the implementation of a decision regarding routine maintenance and/or safety, which generally do not involve a policy weighing decision."); *Marlys Bear Medicine,* 241 F.3d at 1208 (reversing dismissal of suit arising from fatal injury caused by a falling tree because implementation of safety precautions involved technical considerations not based on policy and "therefore not subject to the discretionary function exception"); *Van Orden v. United States*, 1996 U.S. App. LEXIS 12646, 4–6 (9th Cir. May 15, 1996) (reversing dismissal of suit brought by victim injured in her back yard by tree falling from neighboring national park and finding that the suit was not barred by discretionary function exemption because "the inclusion in the contract of specific felling procedures to insure the safety of adjacent landowners" involved "technical considerations" and not "the weighing and balancing of the social, economic, and political policies underlying the broad regulatory scheme that governs the sale of federal timber"); *Gotha v. U.S.*, 115 F.3d 176, 181 (3d Cir. 1997) (holding that discretionary function exception did not apply to the Navy's failure to provide

safeguards on a footpath because it was a "mundane, administrative, garden-variety, housekeeping problem" far removed from the policies of the Navy's mission).

***

The governmental actions challenged by the plaintiff are mandated by applicable regulations and, in any event, not subject to meaningful policy analysis because compliance with those regulations requires only the discretion implicated by the application of scientific or expert professional judgment for the management of trees. Thus, the discretionary function exception to the FTCA is not applicable to bar the plaintiff's claims against the United States. [13]

## IV.   CONCLUSION

The federal defendants' Motion to Dismiss is denied in part and granted in part. Specifically, the motion is granted as to DOI, NPS and the National Capital Region of NPS, and those agencies are dismissed from this lawsuit. The motion is denied as to the United States since the discretionary function exception does not bar the plaintiff's suit. This conclusion does "not decide the merits of the case, but only whether [the plaintiff] is entitled to an opportunity to prove [her] case at trial." *Cope*, 45 F.3d at 450. [14]

An order consistent with this Memorandum Opinion will be contemporaneously entered.

DATE:  March 31, 2017

_____
BERYL A. HOWELL
Chief Judge

---

[13]     The government makes no argument that decisions about recordkeeping, to the extent they are discretionary, are subject to meaningful policy analysis. *See generally* Gov't's Mem. at 11–13; Gov't's Reply at 9–11.

[14]     In this regard, the government has highlighted, in the first sentence of its supporting memorandum, that the incident at issue in this lawsuit occurred "while the District of Columbia was under a state of emergency and enduring the peak effects of Hurricane Sandy," Gov't's Mem. at 1, pointing to both a press report and weather history for the date of the incident, Gov't's Mot. Exs. 1–2. This information, while pertinent to evaluating whether the challenged "governmental conduct fell short of standards of reasonable care," *Loumiet*, 828 F.3d at 941, is immaterial to consideration of the discretionary function exception. *See Allen v. United States*, 816 F.2d 1417, 1421 (10th Cir. 1987) (noting that negligence is irrelevant to whether a discretionary action is based on policy considerations).