UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MARY LOU WALEN ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 15-cv-1718 BAH |
| ) | |
| UNITED STATES OF AMERICA, *et al.* ) | |
| ) | |
| Defendants. ) | |
| ) | |
| ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF DEFENDANT UNITED STATES OF AMERICA'S MOTION FOR
## SUMMARY JUDGMENT

On the afternoon of Monday, October 29, 2012, while the District of Columbia ("the District") was under a state of emergency and enduring the peak effects of Hurricane Sandy,[1] Plaintiff, Mary Lou Walen, was struck by a tree limb or limbs as she walked across Klingle Valley Bridge along Connecticut Avenue in Northwest Washington, D.C.  Plaintiff does not remember the accident and there were no witnesses.  At the time of the accident, the District's Mayor and emergency-management agency director had instructed District residents to remain indoors and to shelter-in-place during the storm, precisely because the heavy winds and rain would likely cause trees to fall.  Defendant the United States of America ("United States") submits that Plaintiff was contributorily negligent for her own injuries not only because she elected to venture outdoors, on a bridge surrounded by trees during a tropical cyclone, but

---

[1]  Though the storm became post-tropical as it moved onshore near Atlantic Beach, New Jersey, and is sometimes referred to as "Superstorm Sandy," the storm's official designation is Hurricane Sandy and that name is used herein.  *See infra.* at 3.

because she had been warned by emergency managers to remain indoors *precisely* due to the risk of falling trees.   In the District, a plaintiff's contributory negligence—the plaintiff's failure to take reasonable care for her own safety—operates as a complete bar to recovery.  The facts material to Plaintiff's contributory negligence are not in dispute and lead to only one conclusion: that Plaintiff failed to exercise the care that an ordinarily prudent person would exercise during a state of emergency in which city officials instructed residents to remain indoors while a destructive tropical cyclone impacted the region.   As a result, the Court should find that Plaintiff's contributory negligence bars her recovery in this case, as a matter of law.

Alternatively, the United States moves the Court for summary judgment on the basis that Plaintiff's claim that the United States negligently managed trees in the vicinity of the accident requires that an expert competently establish the relevant standard of care and United States' of breach thereof.  Discovery in this matter has now closed, and Plaintiff's expert report is wholly insufficient to carry Plaintiff's burden of proof as a matter of law.  As a result, the Court should grant summary judgment in favor of United States because Plaintiff could not possibly carry her burden of proof at trial.

## STANDARD OF REVIEW

Summary judgment should be granted when the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also *Aliron Int'l, Inc. v. Cherokee Nation Indus.*, 531 F.3d 863, 865 (D.C. Cir. 2008) ("summary judgment is appropriate only if 'there is no genuine issue as to any material fact and  the moving party is entitled to a judgment as a matter of law.'").  "When the moving party has carried its

burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Curtis v. Lanier*, 535 F. Supp. 2d 89, 93 (D.D.C. 2008) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). To survive a motion for summary judgment, "the party bearing the burden of proof at trial ... must provide evidence showing that there is a triable issue as to an element essential to that party's claim." *Id*. at 94 (quoting *Arrington v. United States*, 473 F.3d 329, 335 (D.C. Cir. 2006)).

## FACTS

The United States incorporates by reference to the facts set forth in the accompanying Local Rule Civil 7(h) Statement of Material Facts Not in Dispute. At approximately 3:10 p.m. on October 29, 2012—the time of Plaintiff's accident—the District was under a state of emergency as Hurricane Sandy was passing offshore of the Delmarva Peninsula.[2] Hurricane Sandy was no ordinary wind and rain event in the Mid-Atlantic region. The storm began in the Caribbean Sea and by October 26, 2012, had become the largest hurricane (by diameter) on record since the National Hurricane Center ("NHC") began measuring hurricanes for breadth in 1988.[3] By the time the "tremendous" Hurricane Sandy made landfall in New Jersey at approximately 5:00 p.m. on October 29, 2012, the storm marked the lowest barometric pressure ever recorded north of North Carolina, with hurricane-force gusts experienced in seven states and

---

[2]  *See* National Hurricane Center Tropical Cyclone Report, Hurricane Sandy (ALI182012), attached hereto as Exhibit A.

[3]  *Id.* at 1, 6.

wind impact as far west as Wisconsin.[4]  Hurricane Sandy's caused extensive damage and, as of the NHC's final report in February 2013, was the second-costliest hurricane in U.S. history.[5] Tragically, Hurricane Sandy led to 147 fatalities, 72 of which were in the United States.[6] Hurricane Sandy killed two people in Virginia and one in Maryland.[7]

District residents were well informed of the approaching hurricane.  Local meteorologists warned residents of the various impact scenarios as early as October 25, 2012.[8]  On October 26, 2012, District Mayor Vincent C. Gray declared a state of emergency in the District to last for 15 days.[9]  The next day, October 27, 2012, *Washington Post* weather reporter Jason Samanow wrote in an article called "Today is the day to prepare for Hurricane Sandy":

> Sunday into Sunday night will offer the chance as well although rain chances increase and winds slowly ramp up during that time. The worst part of the storm, increasingly, looks to be from Monday through Tuesday in the Washington, D.C. area.

---

[4]  *Id*. at 5.

[5]  *Id*. at 1.

[6]  *Id*. at 1; Table 8, p. 120.

[7]  *Id.* at Table 9, p. 120.

[8]  *See* Jason Samonow, *Hurricane Sandy Scenarios for Washington, D.C.,* THE WASHINGTON POST (October 25, 2012), https://www.washingtonpost.com/blogs/capital-weather-gang/post/hurricane-sandy-scenarios-for-washington-dc/2012/10/25/0ebdb0f2-1ec5-11e2-9cd5-b55c38388962_blog.html?utm_term=.e2caad60d263

[9]  *See* District of Columbia Mayor's Order 2012-186, "Declaration of Public Emergency", October 26, 2012, attached hereto as Exhibit B.

Jason Samonow, *Today is the day to prepare for Hurricane Sandy*, THE WASHINGTON POST (Oct. 27, 2012).[10]

On Sunday, October 28, 2012, Mayor Gray held a press conference to provide an update on the approaching Hurricane Sandy.  At the press conference, the Mayor advised that the District of Columbia government, the Washington Metro Area Transit Authority, and the federal government would be closed on Monday, October 29, 2012.  Mayor Gray also stated, that the District "is likely to suffer significant power outages due to fallen trees and other debris."  The Mayor added that District residents "need to shelter in place during the peak of this storm, preferably on the lowest level of their home and as far away as possible from windows and potential falling trees."

After Mayor Gray's press conference, the District of Columbia emergency management agencies (including the Executive Office of the Mayor, Homeland Security and Emergency Management Agency, and others) issued a joint press release advising of storm preparations and the Mayor's comments and instructions regarding the approaching storm.  The joint press release quoted the Mayor's warnings and instructions and indicated that that the storm's peak effects would be from approximately noon on Monday, October 29, 2012:

> Sustained tropical-storm force winds of 40-60 miles per hour with gusts up to hurricane strength (75 miles per hour or more) are possible, and the duration of the storm's peak impact will likely be several hours—with conditions expected to deteriorate rapidly during the day [October 29, 2012] and the peak of the extreme winds expected between about noon Monday and the early hours of Tuesday morning, with high winds extending well into the day on Tuesday.

---

[10] https://www.washingtonpost.com/blogs/capital-weather-gang/post/today-is-the-day-to-prepare-for-hurricane-sandy/2012/10/27/f62dacc2-203b-11e2-9cd5-b55c38388962_blog.html?utm_term=.5b83237ac67c

Press Release, District of Columba Multi-Agency, "Mayor Gray Closes District Government Monday", October 28, 2012.[11]

The warnings given to District residents by Mayor Grey and the District's emergency management officials were reflected in local news coverage.  The *Washington Post*'s coverage of the multi-agency press conference conveyed District emergency management instructions:

> Speaking in a worried tone, Gray and other city officials also outlined steps they hope city residents take to stay safe during the storm.
>
> In addition to remaining off the streets, Homeland Security Director Chris Geldart said residents who live near tall trees should remain on the lower floors or the basement of their home during the height of storm. Those who live in apartments, he said, should be prepared to move away from windows. City officials expect tropical storm force winds for up to 24 hours and 5 to 10 inches of rain, which they fear will cause trees to topple.
>
> "We are asking that people stay alert, stay indoors and be prepared,' said Geldart.

Tim Craig, Hurricane Sandy:  *D.C. Mayor Gray Calls for Immediate Preparations*, THE WASHINGTON POST, October 28, 2012.[12]

Plaintiff testified that she was aware that a hurricane was approaching the District because it had "been in the news for several days."[13]  Yet, despite the news coverage and information disseminated by the District's Mayor and emergency management authorities,

---

[11]   The District multi-agency press release is attached hereto as Exhibit C and may be found online at http://mobileinaug.dc.gov/release/mayor-gray-closes-district-government-monday.

[12]   https://www.washingtonpost.com/local/dc-politics/hurricane-sandy-dc-mayor-gray-calls-for-immediate-preparations/2012/10/28/b4fd613e-212b-11e2-8448-81b1ce7d6978_story.html?noredirect=on&utm_term=.ef7c906fba38

[13]   Plaintiff's Deposition at 68:23 to 69:1.

Plaintiff elected to venture out of her apartment in Northwest Washington D.C. in the mid-afternoon on October 29, 2012, to attempt to go to the drug store to obtain medication for her son at the Walgreen's in the Cleveland Park neighborhood.[14]   Plaintiff did not call a taxi-cab or ride service; rather, she elected walk along tree-lined Connecticut Avenue and across Klingle Valley bridge—which spans parkland filled with trees.

Plaintiff does not remember anything after closing her laptop in her apartment before she ventured out.[15]   According to the Metropolitan Police Department ("MPD") Washington, D.C. police report, at approximately 3:17 p.m. Plaintiff was struck by a tree limb on the west side of the 3200 block of Connecticut Avenue Northwest—the closest address to the Klingle Valley Bridge.[16]   The MPD investigator dispatched to the scene less than 20 minutes later noted the weather conditions at the time of the accident:  heavy rain and wind.[17]

Weather data and contemporaneous reports from October 29, 2012, indicate that the District did indeed experience heavy rain and strong winds throughout the afternoon and into the evening on October 29, 2012.   The following day, Washington Post meteorologist noted that peak wind gusts of "55-65 mph" struck the District during Hurricane Sandy.  Jason Samenow, *Was Hurricane Sandy well-forecast?,* THE WASHINGTON POST (October 30, 2012).[18]   Moreover,

---

[14]  *Id*. at 32:19 to 33:6.

[15]  *Id.* at 32:6 to 32:13, 33:7 to 33:14.

[16]  The MPD Incident Report is attached hereto as Exhibit D.

[17]   *Id*. at "Evidence Report".

[18]  https://www.washingtonpost.com/blogs/capital-weather-gang/post/was-hurricane-sandy-well-forecast-was-it-over-hyped/2012/10/30/67075e52-22c1-11e2-ac85-e669876c6a24_blog.html?utm_term=.c19039715898 .

October 29, 2012, also set a precipitation record for that day of the year, with 3.85" inches of rain. Justin Greiser, *Hurricane Sandy recap: Historic storm from storm surge to snow,* The Washington Post (October 31, 2012).[19] In fact, 3.85 inches of rain in a single day is more rain than the District gets in an average October.[20] In total, Hurricane Sandy dumped 5.83 inches of rain on the District.[21]

## ARGUMENT

I.   *Contributory Negligence*

A.   The Court Applies the Law of the District of Columbia in this Federal Tort Claims Act Case

The Federal Tort Claims Act ("FTCA") waives the government's sovereign immunity for tort claims arising out of negligent conduct of government employees acting within the scope of their employment, "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). As a result, the law of the District applies to Plaintiff's FTCA action against the United States. *See Harris v. U.S. Dep't of Veterans Affairs*, 776 F.3d 907, 912 (D.C. Cir. 2015).

---

[19] https://www.washingtonpost.com/blogs/capital-weather-gang/post/hurricane-sandy-recap-historic-storm-from-storm-surge-to-snow/2012/10/31/9a7c56d8-2362-11e2-ac85-e669876c6a24_blog.html .

[20] *The Weather Channel*, "Washington, DC Monthly Weather" (updated on October 9, 2018) https://weather.com/weather/monthly/l/USDC0001:1:US .

[21]  NHC Report, Hurricane Sandy (ALI182012), Exhibit A at Table 6, p. 111.

B.  Contributory Negligence in the District of Columbia

Under the substantive tort law of the District, contributory negligence is "conduct 'which falls below the standard to which a plaintiff should conform for [her] own protection' and contributes to the plaintiff's injury." *Stotmeister v. Alion Sci. & Tech. Corp.*, 65 F. Supp. 2d. 56, 72 (citing *Scoggins v. Jude*, 419 A.2d 999, 1004 (D.C. 1980) (quoting RESTATEMENT (SECOND) OF TORTS § 496E, Comment a (1965))).  Where a plaintiff's contributory negligence contributes to the plaintiff's injury in the District of Columbia, it operates as a complete bar of recovery against the defendant.  *See Blake v. Securitas Sec. Servs., Inc.*, 962 F. Supp. 2d 141, 146 (citing *Andrews v. Wilkins*, 934 F.2d 1267, 1272 (D.C. Cir. 1991)).  This is true, even where the defendant may have been negligent in allowing an allegedly hazardous condition to threaten the plaintiff's safety.  *See O'Connor v. District of Columbia*, 921 F. Supp. 2d 5, 6 (D.D.C. 1996) ("[E]ven if there is a basis for plaintiff's allegation that the District was negligent in allowing a puddle to accumulate at the corner of 9th and Pennsylvania, plaintiff's actions constituted contributory negligence which proximately caused her injury.")

The standard by which a plaintiff's contributory negligence is judged in the District is ordinary care:  it is "the failure to act with the prudence demanded of an ordinary reasonable person under like circumstances." *Stotmeister*, 65 F. Supp. 2d at 71 (citing *Stager v. Schneider*, 494 A.2d 1307, 1311 (D.C. 1985)). And because the standard is objective, it turns not upon what the plaintiff knew about her own safety, but what the plaintiff *should have known*:  "[T]he defense of contributory negligence requires a determination of what the plaintiff should have known and acted upon in the exercise of reasonable care for [her] own safety," *Id*. (citing *Morrison v. MacNamara*, 407 A.2d 555, 566 (D.C. 1979)).  Contributory negligence "generally

involves inadvertence or failure to observe or act."  *Id.* (citing *Harris v. Plummer*, 190 A.2d 98, 100 (D.C. 1963)).

Because contributory negligence is an affirmative defense, the defendant must "establish, by a preponderance of the evidence that the plaintiff failed to exercise reasonable care." *Id.* (citing *Poyner v. Loftus*, 694 A.2d 69, 71 (D.C. 1997)). "Ordinarily, questions of negligence and contributory negligence must be decided by the trier of fact."[22]  *Blake*, 962 F. Supp. 2d at 146. But where the facts material to the question of the plaintiff's contributory negligence are not in dispute and support only one reasonable inference, the Court may rule on contributory negligence as a matter of law.  *O'Connor*, 921 F. Supp. 2d at 8; *see also District of Columbia v. Brown*, 589 A.2d 384, 388 (D.C. 1991).

C. Plaintiff's Failure to adhere to emergency management warnings constitutes contributory negligence, as a matter of law

In the instant matter, Plaintiff was injured when a tree limb fell on her when she chose to walk to the drug store, on a route filled with trees, in conditions described by the responding police officer as "heavy wind and rain," while the region experienced conditions caused by a passing hurricane.  Plaintiff's conduct—choosing to venture out, across a tree-lined bridge under such conditions—might constitute contributory negligence on its own, as it is quite possible that an ordinarily prudent person would, in the interest of personal safety, choose to remain indoors until the weather improved.  But in the instant matter, Plaintiff's lack of care for her own safety is far more acute.

---

[22]  In this FTCA matter, the Court is the trier of fact. 28 U.S.C. § 2402.

As Hurricane Sandy approached the Mid-Atlantic region, leaders and emergency managers in the District recognized the threat posed by the storm that ultimately killed 72 Americans across eight states.  The District was under a state of emergency and the city's Major and emergency managers had one primary message to District residents:  stay indoors during the peak effects of the storm anticipated to be after noon on Monday, October 29, 2012, and into the overnight hours *because trees will be falling*.  Plaintiff not only failed to appreciate the risks associated with walking outdoors and crossing a bridge surrounded by trees during a tropical cyclone at the time where the storm's peak effects were anticipated, but Plaintiff failed to observe the most pointed warning given to District residents by the Mayor and emergency managers: stay indoors.

Plaintiff testified that she was aware of the approaching storm because it was "in the news"—and the warnings and instructions from Mayor Gray and the District emergency management officials were transmitted to District residents via live television press conference and in subsequent news coverage.  Under the law of the District, Plaintiff is held to a standard of what information she should have known in reasonable care for her own safety.  Clearly, a reasonably prudent person would pay attention to civil emergency-management information and instructions when the jurisdiction is under a state of emergency.  *See, e.g. Smith v. City of Kinston*, 105 S.E. 2d 648, 653 (N.C. 1958) (hurricanes are significant events for which those impacted may be reasonably inferred to have knowledge thereof).  Accordingly, Plaintiff should have known that her Mayor and emergency management agency director expressly advised her to remain in her home between approximately noon on the day of her accident through the early overnight hours, and that falling trees was a principal risk.

11

While the scope is dramatically different, the facts of the instant matter are not unlike those where a plaintiff encounters a more mundane but known risk and ignores warnings intended to preserve the public safety. For example, in *Krombein v. Gail Service Industries, Inc.,* 317 F. Supp. 2d 14, 19 (D.D.C. 2004), this Court found—as a matter of law—that the plaintiff "departed from the standard of care that is to be expected of a reasonable person" when she walked across a freshly mopped floor, ignoring two "wet-floor" caution signs.

The facts material to the question of Plaintiff's contributory negligence are not in dispute: Plaintiff does not (and cannot) dispute that the District was under a state of emergency in which the District's Mayor and emergency management officials had warned residents to remain indoors between noon and after midnight due to the risk of falling trees, and when Plaintiff ventured out of her home to walk a tree-lined bridge at 3:15 p.m; a tree limb fell on her in conditions described as "heavy rain and wind." Under the law of the District, Plaintiff must be attributed with knowledge of the emergency situation in the District, and her failure to adhere to emergency-management instructions constitutes a failure to employ reasonable care for her own safety. The risk of falling trees was not only reasonably possible, but precisely the risk that formed the basis for the emergency-management instructions to District residents.

Because these indisputable facts lead a reasonable fact finder to but one conclusion—that Plaintiff failed to take reasonable care for her own safety—the Court should find Plaintiff's contributory negligence as a matter of law. Accordingly, the Court should grant summary judgment in favor of the United States.

II. *Plaintiff's Expert Report*

   A. Plaintiff must carry her burden of proof with competent expert testimony

12

In the District, a plaintiff must establish that an alleged negligent act caused her injury – an injury alone is insufficient. *See, e.g., Pepsi Cola Co. v. Waddell*, 304 A.2d 630, 632 (D.C. 1973). "In an action for negligence, the plaintiff has the burden of proving by a preponderance of the evidence the applicable standard of care, a deviation from that standard by the defendant, and a causal relationship between the deviation and the plaintiff's injury." *Varner v. District of Columbia*, 891 A.2d 260, 265 (D.C. 2006) (citations omitted)).

"Where negligent conduct is alleged in a context which is within the realm of common knowledge and everyday experience, the plaintiff is not required to adduce expert testimony either to establish the applicable standard of care or to prove that the defendant failed to adhere to it." *Beard v. Goodyear Tire & Rubber Co.*, 587 A.2d 195, 200 (D.C. 1991) (internal citations omitted). However, a plaintiff may not rely on the common knowledge of the jury "where the subject presented is 'so distinctly related to some science, profession or occupation as to be beyond the ken of the average lay person.'" *Id.* (internal citation omitted); *District of Columbia v. Peters*, 527 A.2d 1269, 1273 (D.C. 1987).

District courts require expert testimony in a "wide variety of situations." *Beard,* 587 A.2d at 200*; see also District of Columbia v. Freeman*, 477 A.2d 713, 719 (D.C. 1984) ("whether a painted crosswalk is sufficient to render a particular intersection reasonably safe is a determination essentially technical in nature," requiring testimony from experts who could place the evidence "in an appropriate context for the jury"). And in the District of Columbia, allegations of negligent tree maintenance require expert testimony. *See Briggs v. Wash. Metro. Area Transit Auth.*, 481 F.3d 839, 845 (D.C. Cir. 2007) (citing *Katkish v. District of Columbia*, 763 A.3d 703, 706 (D.C. 2000)).

13

Where a plaintiff fails to present competent expert testimony in a case requiring it, the Court "must enter judgment for the defendant." *Beard*, 587 A.2d at 200.   While the contents and quality of expert reports may be the subject of *Daubert*[23] motions—which are motions *in limine* by nature—the Court, nonetheless, may consider the competence of a plaintiff's expert report in a motion for summary judgment.  *See Carmichael v. West*, Civ. A. No. 12-1969 (BAH), 2015 WL 10568893, at *6 (D.D.C. Aug. 31, 2015).   In other words, where the plaintiff's proffered expert testimony could not carry the plaintiff's burden of proof at trial, the Court may grant summary judgment, dismissing plaintiff's case as a matter of law.

Before expert testimony may be admitted at trial, Federal Rule of Evidence 702 and *Daubert* require the Court to perform a "gatekeeping" function by "engag[ing] in a preliminary assessment of the scientific validity of the expert's reasoning or methodology." *Ambrosini v. Labarraque*, 101 F.3d 129, 138 n.11 (D.C. Cir. 1996) (citing *Daubert*, 509 U.S. at 592-93). Specifically, the party seeking to introduce the opinion testimony must establish by a preponderance of the evidence, the qualifications of the proffered expert and that: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702; *see also United States v. Hite*, 769 F.3d 1154, 1168 (D.C. Cir. 2014) ("Expert testimony is admissible under Federal Rule of Evidence 702 if it will assist the jury to understand the evidence or determine a fact in issue").  In establishing the reliability of the expert's conclusions,

---

[23] *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

the party proffering the expert need not prove that the expert's opinions are correct but only that a qualified person has reached the opinions in a sound and methodologically reasonable manner. *Carmichael*, 2015 WL 10568893 at *6.  Thus, the Court "must focus solely on principles and methodology, not on the conclusions that they generate." *Ambrosini*, 101 F.3d at 133 (internal quotation marks omitted) (quoting *Daubert*, 509 U.S. at 595)

B.  Plaintiff's expert report provides scant methodology to support its conclusions

It is true that the Court should view *Daubert* arguments made in association with a motion for summary judgment "with great care and circumspection." *Carmichael*, 2015 WL 10568893 at *7 (citing *Cortes–Irizarry v. Corporacion Insular de Seguros*, 111 F.3d 184, 188 (1st Cir.1997)).   The Court, however, should have little difficulty in finding that Plaintiff's proffered export report clearly fails to meet the standard required for competent expert testimony in a liability case.[24]

Plaintiff's expert report, "Tree Report" by Lew Bloch of the Bloch Consulting Group, August 7, 2017, consists of two pages written by the expert and 22 pages of attachments. Plaintiff's expert did not review the deposition testimony of NPS staff arborists Donald Kirk, Diana Bramble, or Michael Papa.  In fact, based on Plaintiff's expert report, it does not appear the expert even visited the accident site to examine the trees there.

Based on photographs that are given no attribution in the report, Plaintiff's expert based his opinion on the appearance of the tree debris depicted in the photographs and concluded that:

> The tree limb that failed and caused the injuries in this matter had been dead, dying, and decaying for several years prior to the incident and should have been discovered and the problem abated if the regular,

---

[24]  Plaintiff's expert report, "Tree Report" by Lew Bloch of the Bloch Consulting Group, August 7, 2017, is attached hereto as Exhibit E.

required tree inspections had been performed properly.  Furthermore, in
spite of the wind and rain event, this limb would not likely have failed if it
had been a healthy, viable limb.

Ex. E at 3.

These conclusions, if supported, could perhaps constitute competent expert testimony,
but Plaintiff's expert provides no methodology whatsoever in how he came to them.  For
example, Plaintiff's expert does not opine on where the limb came from or which tree may have
provided it.  Plaintiff's expert fails to identify the species of tree from which the limb came.[25]
Plaintiff's expert notes that the NPS inspection regime includes drive-by inspections and bi-
annual walk-through inspections in concluding that the NPS failed to adequately inspect this
particular tree, but Plaintiff's expert fails to provide any methodology or arboreal science as to
how a particular inspection would have identified this particular limb as hazardous.  In fact,
Plaintiff's expert's conclusions about the state of the tree are based on one observation:  "If this
had been a live limb that fell, it would not have broken up in such small pieces."  Ex. E at 2.
Yet, Plaintiff's expert provides no scientific support, no reference to arboreal text, no citation or
methodology whatsoever.

Similarly, Plaintiff's expert dismisses the context of Plaintiff's accident—which occurred
during a tropical cyclone—by concluding that "it is likely that this limb would not have failed
from the weather events if it had been a live, healthy limb."  Ex. E at 3.  Yet, Plaintiff's expert
provides no scientific support for this conclusion, nor does Plaintiff's expert even discuss the
weather conditions experienced at the time of the accident.

---

[25]   In his deposition, NPS staff arborist Donald Kirk testified that the species of tree is relevant
in risk assessment and tree-hazard identification.  *See* Deposition of Donald Kirk, May 1, 2018,
at 14:5 - 14:18, 16:5-16:8, 21:13-21:21, attached hereto in relevant part as Exhibit F.

While the Court need not be convinced that Plaintiff's expert's conclusions are incorrect, those conclusions must have been reached in a sound and methodologically reasonable manner. On its face, Plaintiff's expert report fails to meet this standard and is, therefore, insufficient to carry Plaintiff's burden of proof at trial.  As a result, the Court should grant the United States summary judgment.

**<u>CONCLUSION</u>**

Based on the foregoing, the United States respectfully submits that Plaintiff's contributory negligence operates as a complete bar to her claim under the law of the District as a matter of law.  Alternatively, Plaintiff's claims require competent expert testimony to establish the United States' negligence—and Plaintiff's expert report fails to competently establish the United States' breach of the duty of care.  As a result of either conclusion—or both—the Court should grant the United States summary judgment as a matter of law.

Dated: November 20, 2018
Washington, DC

Respectfully submitted,

JESSIE K. LIU, D.C. Bar #472845
United States Attorney

DANIEL F. VAN HORN, D.C. Bar #924092
Chief, Civil Division

By:  _____/s/_____

WYNEVA JOHNSON
Assistant United States Attorney
555 4th Street, NW
Washington, DC 20530
(202) 252-2518
Wyneva.Johnson@usdoj.gov

*Attorneys for Defendant United States of America*

*Of Counsel*
Charles Wallace
Attorney - Advisor
Solicitor's Office - General Law
U.S. Department of the Interior

18