## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MARY LOU WALEN,

      Plaintiff,

v.

THE UNITED STATES Of AMERICA, *et al.*,

      Defendants.

Civil Case No.: 1:15-CV-01718
Judge Beryl A. Howell

### DEFENDANT DISTRICT OF COLUMBIA'S REPLY BRIEF IN SUPPORT OF ITS PENDING MOTION FOR SUMMARY JUDGMENT

Defendant the District of Columbia (the "District"), by and through undersigned counsel, respectfully replies in support of its pending Motion for Summary Judgment (ECF DKT # 43), and in response to Plaintiff's opposition papers (ECF DKT # 49).

**I.     Plaintiff has failed to respond to the District's Statement of Material Facts Not In Dispute.**

As an initial matter, based on undersigned counsel's review of the record, Plaintiff's Opposition to the District of Columbia's Motion for Summary Judgment does not comport with the federal and local rules of civil procedure because it appears to lack a separate statement of disputed facts as required by Fed. R. Civ. P. 56(e) and LCvR 7(h)(1).  The Court may, in its discretion, consider the District of Columbia's statement of facts as conceded. *See Grimes v. Dist. of Columbia*, 794 F.3d 83, 96 (D.C. Cir. 2015)("Under the local rule relevant here, the district court may 'assume' that the nonmoving party 'admitted' any facts that it failed to 'controvert' after the moving party requested summary judgment.")(quoting LCvR 7(h)(1)).

**II.     The Affidavits provided by Plaintiff do not create a genuine issue of material fact.**

Plaintiff's opposition papers include affidavits from Plaintiff Mary Lou Walen and alleged fact witness Eric Kimbuende. (ECF DKT # 49-3, Exhibits G & H).  Walen's Affidavit states that a red umbrella in a debris field on the Klingle Valley Bridge, depicted in photos taken after Superstorm Sandy, was hers. ECF DKT # 49-3, Pl. Ex. G at ¶ 7.  Kimbuende claims that "[i]t was clear which tree the branch had fallen from.[...] I have seen photos of the area and it appears that the tree from which the branch fell is depicted therein in the image attached to this Declaration." Pl. Ex. H, ¶ 8-9.  The photograph to which Kimbuende refers – a photograph which depicts a number of trees – is on page 57 of Plaintiff's exhibits (ECF DKT # 49-3). These affidavits do not create an issue of material fact that might foreclose summary judgment in the District's favor.

First, Kimbuende's Declaration acknowledges that he did not see the tree fall on Plaintiff: "While I was walking I heard a loud crashing sound.[...] I turned toward the sound and noticed that a tree branch had fallen." Pl. Ex. H, ¶ 3-4.  Kimbuende is not qualified to make his deduction that "I have seen photos of the area and it appears that the tree from which the branch fell is depicted therein in the image attached to this Declaration." *Id.* at ¶ 9.  This inadmissible testimony, a guess by a lay witness unqualified to opine about trees, cannot create a genuine issue of material fact.

Even if the opinion were admissible, it does not, contrary to the conclusion Plaintiff would like this court to draw, identify the tree from which the branch fell.  First, as has already been noted, the witness did not see the incident happen, but rather approached the Plaintiff after it had already occurred.  Also, the photograph to which the witness refers depicts several trees. Notably, the Kimbuende's affidavit did not specifically identify any of them as the one from

which the branch allegedly fell.  The testimony cited in Kimbuende's affidavit does not corroborate Lew Bloch's speculative conclusion that the tree depicted in the center of the photograph is the one that caused Plaintiff's injury.

Plaintiff Walen's Affidavit states that the red umbrella depicted in photos taken on the bridge after her injury belonged to her. Pl. Ex. G at ¶ 7.  Plaintiff argues that this demonstrates that the tree debris on the bridge, which is intermingled with the red umbrella, struck her. Pl. Br., page 18.   Yet Plaintiff testified at her deposition remembers nothing about what happened to her on the bridge after she was injured, and she has no knowledge of how her umbrella ended up where it did, or whether the pile of debris on the bridge shows the tree material that struck her.  The MPD photographer who took the photos of the tree debris and the red umbrella was never deposed, nor was anyone else who visited the scene on the day of Plaintiff's injury. Kimbuende's Declaration is silent about an umbrella.  Put simply, Plaintiff is unable to competently testify that the debris field depicted in the MPD photos shows what struck her. The existence of a red umbrella in the photos is a *non sequitur*.  Plaintiff has failed to point to evidence to support her expert Lew Bloch's opinion that the tree depicted in the photos shed the limb that struck Plaintiff.  Bloch's belief is nothing more than a guess, and neither Plaintiff nor Kimbuende can offer anything to bolster it.

Moreover, as noted in the District's Motion, Bloch did not even mention the District in his report, which concerns the National Park Service alone. (ECF DKT # 43-1, Defendant's Ex. K, Pl. Expert Report, *passim*).  Bloch wrote his report before discovery took place, and so he never reviewed the sole deposition taken of a District employee, DDOT Urban Forestry Supervisor Forester Munevver Ertem.  Plaintiff's opposition papers include an Affidavit by Lew Bloch that, for the first time, mentions the District of Columbia.

Bloch argues:

> Both and NPS [*sic*] and/or the Urban Forestry Division should have
> encountered this hazardous branch during regular maintenance
> procedures.  Dead/dying branches would have had no leaves or
> viable buds on them.  Also, based on the photos I reviewed these
> limbs had conks (fruiting bodies) growing on them and the bark was
> peeling off of them which would have been noticed during an
> inspection.

Pl. Ex. I, ¶ 9.

Plaintiff's expert reports were due on July 5, 2017 [Minute Order dated 4/18/2017], yet Bloch

did not mention the District until his Affidavit was provided with Plaintiff's opposition papers

on December 21, 2018 -- more than seventeen months late.  This failure is highly prejudicial to

the District and lacks any justification.  Therefore, any testimony by Bloch about the District

must be excluded from trial. *See, e.g., Halcomb v. Washington Metro. Area Transit Auth.*, 526

F. Supp. 2d 24, 28 (D.D.C. 2007) ("Rule 37(c)(1) provides for the exclusion at trial of any

information not disclosed pursuant to Rule 26(a), unless the failure to disclose is harmless, or if

there is substantial justification for such failure.[...] the Court will not allow defendant to offer

or elicit any expert opinions that Mr. Mazzei has not previously offered during discovery.")

Further, this Affidavit does not correct the core deficiency in Bloch's report: its total

lack of reference to the District of Columbia.  The Affidavit contains a naked conclusion that

the District should have discovered the "dead/dying branches," without any analysis or

reference to the record.  Bloch offers no methodology other than the fact that he reviewed

photographs and has "over 40 years of experience." Pl. Ex. I, ¶ 5,6.  Bloch does not state what

the District's duty was, does not explain what the District's tree inspection methodology was,

and does not explain what the District's relationship to the NPS tree inspection was.  His

argument boils down to the following: if "dead/dying branches" fall, then the District has

violated its duty, which is the same duty as NPS's. Pl. Br., page 17.  Bloch cannot simply bypass his duty to state the "reasoning or methodology" for his conclusions about the District's tree inspection plan. *Daubert v. Merrell Dow Pharmaceuticals*, *Inc.*, 509 U.S. 579, 593 (1993). Further, Bloch's newly proffered conclusions about the District are demonstrably incorrect.

As noted in the District's Motion, Bloch identifies the United States' duty of care based on the National Park Service's "A-123 Internal Control Assessment Program and Tree Management Action Plan." (ECF DKT # 43-1, Defendant's Ex. K, Pl. Expert Report, page 2). This technical document applies to the NPS, not the District.  It may state NPS's tree management protocol, but it does not state the District's.  The jury has no factual basis to determine that the District violated its tree management protocol, and no basis for determining that the District deviated from a national standard.  This, standing alone, requires summary judgment in the District's favor.

If Plaintiff's standard is adopted, public entities will be held to a strict liability standard whenever tree limbs cause injury.  Tree maintenance and repair is an issue far beyond the ken of an average juror, *Katkish v. Dist. of Columbia*, 763 A.2d 703, 706 (D.C. 2000), which Plaintiff admits. Pl. Br., page 17.[1]  Expert testimony is therefore required to establish the District's duty of care, and how it deviated from that duty. *District of Columbia v. Arnold & Porter*, 756 A.2d 427, 433 (D.C. 2000).  Bloch's conclusory opinion fails to show what the District's duty was or how it breached that duty.  With no expert testimony to support her claim that the District was negligent, her claim must fail, regardless of whether Bloch identified the correct tree or not.

---

[1] Plaintiff admits that "The expert must relate the standard of care to the practices generally followed by other comparable governmental entities or to some national standard recognized by such units." *Id.*

Plaintiff also argues that her "expert weather report repeatedly states that a branch similar in size to the one that struck the Plaintiff would not have failed when exposed to the weather conditions experienced at the time of the occurrence." Pl. Br., p. 9, FN 1.  This expert, Thomas Downs, is a *meteorologist.*  (ECF DKT #43-1, Defendant's Ex. L, Pl. Expert Rebuttal Report by Thomas E. Downs).  He does not study trees.  He is not qualified to opine about trees, let alone about the District's tree inspection or maintenance policies.  Further, his opinion about tree relies on a study called "A Recommendation for an Enhanced Fujita Scale." *Id.* at page 3 of 4.  Yet this study plainly states that it is a "recommendation" for a revision to the Fujita Scale, which provides "a method to rate the intensity of tornadoes.  The intent of the scale was to distinguish between weak tornadoes and strong tornadoes." Texas Tech Wind Science and Engineering Center, "A Recommendation for an Enhanced Fujita Scale (June 2004), page 1.[2]  The Fujita Scale applies to **3-second wind gusts**, such as those caused by tornados -- not to the sustained heavy winds and rain associated with Superstorm Sandy. *Id.* at page 10 (emphasis added).  Applying a wind scale that measures "3-second wind gusts" to what Downs admits was a sustained, hours-long storm with sustained rain (he begins his analysis of wind speeds at 12AM on the day of Plaintiff's injury) is simply nonsensical.  The Fujita Scale does not even consider rain.  Downs's baseless opinions on the effects of short bursts of tornado winds on trees was in error and cannot foreclose summary judgment in the District's favor.

Plaintiff relies on Downs's report for his claims that "the rain fall and wind speed at 3:00 p.m. that day were measured at .2 inches and 20mph respectively" (Pl. Br., page 8), yet Downs makes no such representations in his report (and indeed, Downs has no data from 3PM).

---

[2] Available at https://www.spc.noaa.gov/faq/tornado/ef-ttu.pdf (last accessed on December 26, 2018).

Downs actually opined:

> To a reasonable degree of meteorological certainty, at the subject Premises and at the time of the incident, October 29, 2012 at about 3:15 p.m., skies were overcast, rain was falling with a temperature of around 52°F and the wind was out of the northwest around 28 mph with gusts up to 40 mph.

ECF DKT #43-1,Defendant's Ex. L, Pl. Expert Rebuttal Report by Thomas E. Downs, page 4.

Again, this estimate totally ignores the <u>sustained</u> hours-long wind and rain event that had occurred up to that point, and reflects Downs's ignorance about what causes trees to fail in storms. Plaintiff's comparison of Superstorm Sandy to a "flash flood," or any other acute event like a tornado, is totally misplaced based on the available data.

Plaintiff includes with Downs's report ten pages of "Local Climatological Data" from October 2012 (ECF DKT # 49-3, page 38 to 48). This data was not provided when Downs's report was served, but it shows that rain began falling at Reagan Airport on October 28, 2012 at 5:52PM, and did not stop falling into long after Plaintiff's injury the following day. (ECF DKT # 49-3, page 39 to 40). Downs's data also shows that 20 MPH or greater wind gusts began at Reagan on October 28th at 7:52AM (the day before Plaintiff's injury), and occurred again and again Plaintiff's injury at "approximately 3:15PM" on October 29th. Pl. Compl., ¶ 7. Downs's data also shows wind gusts above 25 MPH at Reagan on October 29th happened again and again in the hours before her injury (they had also occurred six times on the previous day):

| Time | "Wind Gusts" at Reagan on October 29, 2012 (per Downs's data) |
| --- | --- |
| 5:52AM | 26 MPH |
| 6:00AM | 29 MPH |
| 7:52AM | 26 MPH |
| 8:52AM | 36 MPH |
| 9:41AM | 34 MPH |
| 9:52AM | 32 MPH |
| 10:47AM | 36 MPH |
| 10:52AM | 34 MPH |
| 11:52AM | 38 MPH |
| 12:52PM | 43 MPH |

| 1:50PM | 45 MPH |
|--------|--------|
| 1:52PM | 45 MPH |
| 2:18PM | 40 MPH |
| 2:50PM | 41 MPH |
| 2:52PM | 41 MPH |
| 3:10PM | 45 MPH |
| (Plaintiff is injured at "approximately 3:15PM") | |
| 3:52PM | 52 MPH |

ECF DKT # 49-3, page 40.

Plaintiff walked onto the bridge approximately five minutes after a 45 MPH gust was recorded at Reagan Airport. Data provided by Plaintiff's own expert, Downs, therefore totally contradicts Plaintiff's argument that Plaintiff chose to walk outside during a period of "average rainfall and wind speed," or that "the storm had not actually begun to manifest in the D.C. area at the time of Plaintiff's injury." Pl. Br., page 7, 8. The raw data proves otherwise.

Of course, Downs is not qualified to opine on the impact of sustained high winds on trees, and Downs totally ignores the impact of more than twenty hours of prior rain.[3] As the District's expert arborist Mark Webber explained, the conditions *before* Plaintiff's injury are central to why the tree or tree limb failed:

> [T]he sustained variable oscillating forces of the top wind gust for the 30-year average combined with the flooded soils, rain driven winds and tree leaves (Perry 2008), that caused the wood fibers of many previously structurally sufficient tree branches and roots to fail due to fatigue loading (Leigh 2014). The rain data that Downs failed to consider in his findings, in this case, demonstrates that soils near the incident area would have produced flooded conditions and would have likely caused trees that were previously structurally sufficient to fail (Yang 2014). The flooded soils likely caused for the roots of trees to lose cohesion with the soil.

Attachment "A", District's Expert Rebuttal Report by Mark Webber.

---

[3] Downs's data appears to show that nearly 3 inches of rain fell at Reagan Airport between October 28, 2012 at 5:52PM and time of Plaintiff's injury, 3:15PM the following day. ECF DKT # 49-3, page 39-40, column "Precip Total (in)."

The issue of tree failure, the District's Act of God defense, and Plaintiff's contributory negligence are all centrally implicated by the weather conditions prior to Plaintiff's injury. Plaintiff is not qualified to argue that "Plaintiff was struck by the negligently maintained tree branch less than half an inch of rain had fallen and wind speeds were only measured at approximately 20mph (with brief gusts up to 40mph), far too weak to cause the tree's limb to fail had it been healthy" (Pl. Br., page 8), even if this representation of conditions were remotely accurate.  As Downs's data shows, Plaintiff's representation is not accurate.

Further, Plaintiff's scurrilous claim that the District presented data "intended to lead the Court astray" is contradicted by the data provided by Downs: the peak wind event at Reagan Airport arrived on October 29th (60 MPH at 8:52 PM), and wind speeds died on October 30th. Plaintiff's *ad hominem* arguments the fact that the District's representation that "Plaintiff's injury occurred that Monday, October 29, 2012, 'the worst part of the storm' in the District"[4] is demonstrably correct, based on the data that Downs provides.  October 29th was the worst day of the storm in the District.  The news media reported this fact and the meteorological data confirmed it.  As noted in the underlying brief, the Washington Post reported at 9:15AM on October 29th, "Winds, so far, are not too bad, sustained at around 20 mph, with some gusts over 30 mph in the region, highest east. **They will steadily pick up this morning and become dangerous this afternoon.[...]**" *See* ECF DKT # 43, page 6 (emphasis added).  Armed with forecasts like this one, the District declared a State of Emergency, urged people to stay indoors. Despite the warnings and the wind and rain, Plaintiff chose to walk across the Klingle Valley Bridge.

---

[4] ECF DKT # 43, District's brief in support of Summary Judgment, page 12.

Plaintiff's argument that the storm was worse elsewhere, or became worse later on October 29th, was never disputed, and it has zero no bearing on any of the issues before this Court. The real issue is the lack of competent expert testimony regarding the District and its duty of care. Without such testimony, Plaintiff's claims against the District must fail.

### III.   Plaintiff has no evidence that the District violated its discretionary tree inspection plan.

Plaintiff claims that *Husovsky v. United States*, 590 F.2d 944 (D.C. Cir. 1978) controls here regarding the issue of discretionary immunity.[5] As this Court has previously noted, "The United States did not raise the discretionary function exception in Husovsky[.]" *Walen v. United States*, 246 F. Supp. 3d 449, 454 No. 5 (D.D.C. 2017). *Husovsky* held that the District and the United States had a duty to "to use reasonable diligence to protect motorists on Klingle Road from hazards posed by the land." 590 F.2d at 953. The District has demonstrated that Plaintiff has not provided any evidence to show that the District deviated from a duty of "reasonable diligence," or that its partial reliance on the United States to remove problem trees from the Klingle Valley was unreasonable. Without such testimony, Plaintiff's claims against the District must fail. DDOT's decision to rely on reports and complaints to trigger inspections of the tens of thousands of trees under its control falls within its sound discretion and has not been challenged by an expert report.

Further, the *Husovsky* Court did not concern a single tree branch as depicted in the photos showing the bridge debris, but an "an enormous, multi-trunked tree that is unusually susceptible to weakening and that has a ninety-foot, overhanging stem weighing ten tons[.]" *Id.*

---

[5] Importantly, the Plaintiff in *Husovksky* produced an expert liability report that relied on National Park Service guidelines. *Id.* at 948, FN 5. As explained in Point I, above, Plaintiff's expert in this matter failed to explain what duty the District of Columbia had or breached in his expert report, and failed to explain the basis for his new opinion in his Affidavit that the District had breached its duty.

at 250.  That tree had plainly visible features that signaled, likely for decades, that it was susceptible to weakening: "tight V-shaped formations supporting enormous stems." *Id.* at 951. To extend the duty to periodically inspect such an "enormous" tree into a duty to locate "dead, [*sic*] dying, and decaying" tree branches in a forest is not supported by the rationale in the *Husovsky* decision.

Plaintiff also argues that the District's actions "are not of the class intended to be protected by the Federal Tort Claims Act's ("FTCA") discretionary function exception. Pl. Br., pages 13-14.  Plaintiff is mistaken as a matter of law.  Plaintiff argues, "The District's tree inspection and removal plan is purely ministerial as it prescribes procedure for tree removal which the District must abide by." *Id.* at page 14.  Plaintiff relies on this Court's earlier holding that:

> NPS staff is mandated to conduct monthly inspections of trees on a primary road, bi-annual inspection of trees that pose a risk to the public, and comply with specific industry standards for tree care. NPS staff is also mandated to document "[i]nspections and corrective actions taken," as well as keep other records. These clear mandates remove the immunity shield provided by the discretionary function exception in the FTCA.

*Walen v. United States*, 246 F. Supp. 3d 449, 459 (D.D.C. 2017).

This holding, of course, applied to the NPS, not the District.  This Court determined that:

> [P]laintiff's complaint challenges the exercise of professional and scientific assessments of the Park's trees lining the Connecticut Avenue Bridge, which assessments **were supposed to be conducted pursuant to NPS's prior policy choice to adopt the Draft Tree Plan**, and does not implicate NPS's policymaking regarding the balancing of competing considerations in preserving the Park while protecting public safety.

*Id.* at 465 (emphasis added).

11.

With Discovery over, the record in this case is devoid of any evidence that the District violated its own tree inspection scheme, or that its scheme deviated from its national standard of care. Plaintiff uses the testimony of DDOT Urban Forestry Supervisor Forester Munevver Ertem to argue that "trees within fifty feet of the District's roadways are within the control of both the National Park Service and DDOT." Pl. Br., page 10.[6]   Yet there is no evidence that places the alleged tree which struck Plaintiff within fifty feet of the roadway.  Plaintiff's expert meteorologist, Thomas E. Downs, and his expert arborist, Lew Bloch, did not even bother to mention this crucial issue.  The District has the discretion to rely in part on NPS to locate problem trees on NPS property.  Plaintiff's failure to identify a "specific mandatory directive" or "clear duty" that the District violated, despite Ertem's testimony to the contrary, means that the District has satisfied the first prong of the discretionary immunity test. *Berkovitz by Berkovitz v. United States*, 486 U.S. 531, 544 (1988).

The District also satisfied the second prong of the discretionary immunity test, because its tree inspection scheme is within the intended scope of the discretionary function exception that Congress intended to protect.  NPS chose to adopt ANSI standards as part of its relatively exhaustive tree plan, thereby removing most of its employees' discretion in tree inspection. 246 F. Supp. 3d at 460.  No evidence exists in the record that the District removed the issue of tree inspection from the control of its tree personnel by adopting a binding standard for when and how to conduct inspections.  As this Court noted, "the discretionary function exception bars suit" when "the challenged conduct actually involved discretionary decisions to effectuate a government program, no matter the rank of the government actor, whether high-level government administrators or their subordinates." 246 F. Supp. 3d at 461.  As DDOT Urban

---

[6] The excerpt from Ertem's deposition transcript that Plaintiff provided as her Exhibit A includes a discussion of the "Klingle Road," which runs along the valley floor, not the Klingle Valley Bridge that runs over the valley.

Forestry Supervisor Forester Munevver Ertem testified, DDOT's chosen policy was to not perform routine inspections of trees in the Klingle Valley. (ECF DKT # 43-1, Defendant's Ex. G, Deposition Transcript of Munevver Ertem [excerpt] at 12:3.  Instead, DDOT relied on resident reports and complaints to make inspections. *Id.* at 12:24 to 13:1; 16:8 to 16:10.  This is the essence of a policy judgment, and is properly immunized.

## **CONCLUSION**

For all of the above reasons, summary judgment should be entered in favor of the District of Columbia, dismissing Plaintiff's Complaint against it with prejudice.

DATE: January 11, 2019                    Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General
Civil Litigation Division

/s/ *Michael K. Addo*
MICHAEL K. ADDO [1008971]
Chief, Civil Litigation Division Section IV

/s/ *Benjamin E. Bryant*
BENJAMIN E. BRYANT [1047632]
Assistant Attorney General
Civil Litigation Division Section IV
441 Fourth Street, NW, Suite 630 South
Washington, D.C. 20001
202-724-6652
202-730-0624 (fax)
benjamin.bryant@dc.gov

*Attorneys for Defendant District of Columbia*

**<u>Certification of Service</u>**

The undersigned counsel hereby certifies that on January 11, 2019, he caused this brief to be filed with the Court via ECF electronic filing, which caused copies of same to be served on all counsel of record.

DATE: January 11, 2019                  */s/ Benjamin E. Bryant*_____
                                        BENJAMIN E. BRYANT

# ATTACHMENT "A"

# THE EXPERTS
# Robson Forensic

September 11th, 2018

Benjamin E. Bryant [1047632]
Assistant Attorney General
Civil Litigation Division, Section IV
Office of the Attorney General for the District of Columbia
441 4th Street NW, Suite 630 South
Washington, D.C. 20001
202-724-6652 (phone)
202-730-0624 (fax)
benjamin.bryant@dc.gov

Re:     Walen vs The United States of America, et al.
        Case # 1:15-CV-01718-BAH

Dear Attorney Bryant:

On July 16th, 2018 I submitted a report and my findings were as follow:

1.0 Hurricane Sandy was an unforeseen extreme weather event that was the cause of tree and branch failures irrespective of their structural sufficient condition.

2.0 The reasonable and prudent actions of the National Park Service and the District of Columbia Department of Forestry Urban Forestry Division in performing inspections and maintenance of the forest could not have prevented the tree and limb failures that occurred from the extreme weather conditions of Hurricane Sandy.

3.0 No evidence has been presented that identifies the species, location or condition of the subject tree that the branch fell that resulted in Walen's injuries, therefore the claim has no merit.

4.0 The failure to establish the dangerous condition of the tree resulting in injury makes the claim of injury to Walen without merit.

5.0 Bloch failed to consider weather data as a key part of this tree failure incident, and he failed to consider this in his analysis resulting in his findings to be without merit as he failed to use reasonable principles and methods to the facts of the case.

6.0 The weather conditions were dangerous, and notice was made to the public of tree and tree limb failures due to the foreseeable dangerous conditions that a hurricane creates. Walen ignored these warnings resulting in her injury.

Benjamin E. Bryant, Esq.
September 11, 2018
Page 2

Since that report, an Expert Rebuttal Expert Disclosure was issued by the plaintiff's counsel on August 15th, 2018. You have inquired since that disclosure:

- ➢  if my findings have changed in this matter;
- ➢  if the report issued in part of this disclosure by Thomas Bell is arboricultural and horticulturally valid as they pertain to the facts of this case.

All the opinions herein are expressed with a reasonable technical certainty as an International Society of Arboriculture Board-Certified Master Arborist, Tree Risk Assessor, MArborA, Certified Professional Horticulturist and a Licensed Tree Expert and subject to change if additional information becomes available.

**Additional Materials Available for Review**

1.  Plaintiff Mary Lou Walen Rule 26(a)(2)(B) Rebuttal Expert Disclosure dated August 15th, 2018
2.  Thomas Bell Report dated August 15th, 2018
3.  Curriculum Vitae of Thomas E. Downs, V
4.  Selected Cases of Thomas E. Downs
5.  Weather Data for Montgomery County (Gaithersburg)Maryland for October 29th, 2012
6.  A Recommendation for an Enhanced Fujita Scale-Texas Tech 2004

**Background of New Information**

Thomas Downs provided a report dated August 15th, 2018.  Thomas Downs is a meteorologist and not a Certified Arborist nor does he have any specialized education or life experiences involving trees and their interaction with the weather. He reviewed two sets of weather records from Reagan International Airport and College Park Maryland and admitted that weather observations are made at approximately 33 feet above the ground surface. Downs opinions in his report were as follows:

1.0 Winds at the time of the incident were that rain was falling and winds were out of the Northwest with gusts up to 40 miles.

*2.0* That no wind gust occurred of a magnitude expected to break off large branches from a healthy hardwood tree in full leaf and that my report stated that the trees were defoliated at the time of the incident.

*3.0* That the forested condition near the incident area would have lowered wind speeds due to surface friction.

Benjamin E. Bryant, Esq.
September 11, 2018
Page 3

Downs claims he supported his opinions by the use of weather records and a scientific study entitled: "*A Recommendation for an Enhanced Fujita Scale-Texas Tech 2004*".

**Thomas Downs is not qualified to provide professional opinions about Arboricultural topics of trees and how they fail in hurricane conditions.**

My Review of Downs curriculum vitae fails to demonstrate that he has the educational, certifications, qualifications nor work experience requirements to have specialized knowledge, understanding or expertise that surround the facts of this case as it related to trees and arboriculture. Downs education is not rooted or has ever been vetted or tested or achieved any degree/certification/qualification in the plant sciences. Downs holds a degree in Atmospheric Science/Meteorology. Downs relevant work experiences have been weather forecasting and analysis of weather data. Additionally, he is not a Certified Arborist[1] nor Licensed Tree Expert or is he a Tree Risk Qualified Assessor[2]. His lack of training and education in the realm of tree failures is demonstrated by his statement in his report on page 3-4 were he states that if a tree is healthy, they are structurally sufficient. A tree can be green and structurally not sufficient to manage loads under normal weather conditions (Dunster 2013). Equally, a tree can be absent of leaves and be structurally sufficient to manage loads placed on the tree during normal weather conditions.

Downs statements about trees structure and health are far removed from science and are unfounded and are not well rooted or anchored by any measure of peer-reviewed science (Mattheck 2015).

Additionally, Downs only states he has two professional affiliations. One is with the American Meteorological Society and two with the National Weather Service Skywarn Spotter. Either affiliations are not organizations or groups that study trees and their relationship to failures and weather. Downs CV demonstrates he is not vetted as a tree expert or has he been designated by the American Meteorologist as a Certified Consulting Meteorologist[3]. Downs claims of the Skywarn Spotter[4] as membership is not an organization that meets on a regular basis or as a membership and it is a mere 2-hour training program[5] on weather information and reporting. The National Weather Service states that this training consists of these topics[6] :

---

[1] https://www.treesaregood.org/findanarborist/verify (Search September 8th ,2018)
[2] https://www.treesaregood.org/findanarborist/verify (Search September 8th ,2018)
[3] https://wcdirectory.ametsoc.org/certified-consulting-meteorologists (Verified with a search on September 7, 2018)
[4] Skywarn® is the National Oceanic and Atmospheric Administration's (NOAA) National Weather Service's (NWS) severe weather spotting program with nearly 290,000 trained volunteers nationwide. Since the late 1960s, trained Skywarn® spotters have helped support the NWS' primary mission of protecting life and property through the issuance of severe weather warnings. These dedicated citizens help keep their local community safe by conveying severe weather reports to their local NWS Forecast Office. Skywarn® spotters are integral to the success of our Nation's severe weather warning system. Every year the NWS conducts Skywarn® spotter training sessions. The NWS currently has 122 Weather Forecast Office's across the nation, each with a Warning Coordination Meteorologist, who is responsible for administering the Skywarn® program in their local area. **There is no charge and a typical class takes about 2 hours to conduct.**
[5] Collected from https://www.weather.gov/SKYWARN (September 7, 2018)
[6] Collected from https://www.weather.gov/SKYWARN (September 7, 2018)

Benjamin E. Bryant, Esq.
September 11, 2018
Page 4

- ✓ Basics of thunderstorm development
- ✓ Fundamentals of storm structure
- ✓ Identifying potential severe weather features
- ✓ Information to report
- ✓ How to report information
- ✓ Basics of weather safety

This two-hour educational program's purpose is to provide class members the ability to make weather observations to the national weather services on conditions that cannot be detected by their radar systems and does not have anything to do with trees or how they respond to wind with rain in hurricane conditions[7]. My analysis as a Board-Certified Master Arborist, Certified Licensed Tree Expert and category 5 arborist in the United Kingdom and qualified tree risk assessor is that Downs is not qualified to make opinions about trees. Downs training, education or life experiences and affiliations have no foundation in arboriculture and trees and how they fail in weather conditions that surround the facts of this case[8]. This analysis is underpinned by the facts listed on the National Weather Services pubically assessable website entitled: NWS SKYWARN Storm Spotter Program. That web site states:

> the main responsibility of a SKYWARN® spotter is to identify and describe severe local storms[9].

This further underscores the facts that Thomas Downs is not qualified to provide professional opinions about Arboricultural topics of trees and how they fail in hurricane conditions.

**Downs claim that the tree was structurally insufficient and failed due to a structural deficiency is without merit. Downs has failed to consider all of the facts about the weather data in this case. It was the hurricane wind conditions that caused the failure of trees that were structurally sufficient.**

Downs states that winds were from the Northwest around 28 mph and gusted up to 40 mph at the time of the incident at Reagan International Airport. Downs failed to consider all of the weather data in the general area as I provided in my report including the facts that winds were combined with rain and those forces were in an oscillating pattern. Downs failed even to consider the weather data for Gaithersburg Maryland that is approximately 18.00 miles from the incident site at the time of Walen's injury. The Gaithersburg data reported by Weatherunderground states that winds were from the North and oscillated to the Northwest from approximately 9:35 am to 3:15 pm and contained gusts that ranged from 20 miles to 43 miles per hour. This oscillated pattern of wind is similar to those shown in Downs report and played a significant role in the failure of many trees in this event. In fact, Downs report failed to challenge this research or finding. Down's

---

[7] Collected from https://www.weather.gov/SKYWARN (September 7, 2018)
[8] Collected from https://www.weather.gov/SKYWARN (September 7, 2018)
[9] Collected from https://www.weather.gov/SKYWARN (September 7, 2018)

analysis discusses the conditions from two weather stations from the incident site at the time
Walen sustained injuries. Downs should have known of these case crucial facts and data by virtue
of his training and education has a meteorologist. Downs knew or should have known that the
winds and rains associated in hurricane conditions are variable and oscillating. Contrary to his
education and training, he has failed to consider this in his analyses which result in findings that are
without merit.

Additionally, Downs dismisses that the typical wind direction in the greater Washington DC area, as
exhibited in Photograph 6 of my report establishes facts of winds being typically from the West by
Northwest and from the South. Downs does not dispute this, and my report further demonstrates
the winds are less frequently from the North, North by Northwest or from the East. Trees develop
adapted growth in wood fiber production to manage loads created by dominating wind and
weather patterns. During the period of the incident on October 28th, the winds began in a variable
direction of North by Northeast (010-050). Then the winds changed in a variable direction of the
North to the North by Northwest (320-360). After the change in direction, the winds began to gust.
It is likely the change in wind direction to an irregular pattern placed forces on trees that were
unusual and those that had not been frequently experienced prior.

However, Downs failed to apply his education and training and consider these facts in his analysis
and findings. Moreover, Downs failed to provide a reasonable and prudent analysis of the 30-year
weather data (CENTER 1998) that I discussed in my report from The National Oceanic and
Atmospheric Administration (NOAA) for the 30-year average top wind gust speed for the month of
October in the Baltimore & Camp Springs Maryland region. Had Downs performed the proper
investigation, his conclusions would have produced the same finding as mine in this case.

Downs failed to research and consider the facts that Baltimore & Camp Springs Maryland are
approximately 20 miles from the incident site[10]. Baltimore & Camp Springs is the nearest 30-year
data weather reporting stations to the incident site. The NOAA data states that the top average
wind gust for October for a 30 year period is 47 miles and 54 miles per hour for Baltimore & Camp
Springs Maryland respectfully (CENTER 1998). The same NOAA weather data that Downs claim he
relied on states that there was 6.73" of rain that had fallen.  A 90 mph wind gust was reported at
the Chesapeake Bay Bridge[11], which is 55 miles from the incident site, and these conditions
occurred approximately 6 hours prior to the incident[12]. Weather data from both Reagan
International Airport and Andrews Air Force Base demonstrate sustained winds for the period of
7:19 AM to 3:15 PM for the incident day were at 25-38 miles per hour with a variable top wind gust
ranging from 25-48 miles per hour. The incident wind gusts of 46 miles per hour are approximately

---

[10] https://www.google.com/search?rlz=1C1CHFX_enUS515US515&ei=JQlGW5WxKonQjwTKq6LQCw&q=camp+springs+
mtland+to+Connicut+bridge+washington+DC&oq=camp+springs+mtland+to+Connicut+bridge+washington+DC&gs_l=psy-
ab.12...2442702.2448581.0.2451125.16.16.0.0.0.0.554.2625.0j10j2j5-1.13.0....0...1.1.64.psy-ab..3.0.0....0.81ElVbVUQqg (Collected
July 11, 2018)

[11] https://www.washingtonpost.com/blogs/capital-weather-gang/post/hurricane-sandy-recap-historic-storm-from-storm-surge-to-
snow/2012/10/31/9a7c56d8-2362-11e2-ac85-e669876c6a24_blog.html?noredirect=on&utm_term=.179953d31154 (Collected July
7th ,2018)

[12] National Weather Service weather data from October 28-29 from Camp Springs Andrews Airforce Base

85%[13] to 97%[14] of top wind gust for the 30-year average for October. However, Downs fails to discuss its ramifications and how it would affect vegetation. Instead, he applies a wind scale designed for tree damage in tornado and thunderstorm events.

Most compelling is Downs failure to consider the sustained variable oscillating forces of the top wind gust for the 30-year average combined with the flooded soils, rain driven winds and tree leaves (Perry 2008), that caused the wood fibers of many previously structurally sufficient tree branches and roots to fail due to fatigue loading (Leigh 2014).  The rain data that Downs failed to consider in his findings, in this case, demonstrates that soils near the incident area would have produced flooded conditions and would have likely caused trees that were previously structurally sufficient to fail (Yang 2014). The flooded soils likely caused for the roots of trees to lose cohesion with the soil. (Mattheck 2015)

Downs claim that the tree was structurally insufficient and failed due to a structural deficiency is without merit. Downs has failed to consider all of the facts about the weather data in this case.  It was the hurricane wind conditions that caused the failure of trees that were structurally sufficient.

**Downs claims that trees had lost their leaves are not supported by the evidence or is it stated that way in my report.**

Downs claims that my statement in my report that the trees were in fall leaf drop somehow eludes that all the trees around the incident bridge were leaf-less prior to the incident. My statement was as follows:

> *Photograph 4 of this report depicts the trees at the time of the incident to be in leaf drop. These photos show no dead tree branches overhanging the bridge but does show tree branches on the bridge. Photograph 5 exhibits a tree with no leaves with fine branches that exhibit the tree was likely alive[15].*

Photograph 4 and 5 of my report were captured after the incident area had experienced the effects of Hurricane Sandy, not as Downs claims that the trees were leaf-less prior to the storm. These two photographs show trees with leaves on them. Downs statement is false and not rooted in reliable tree science nor peer-reviewed journals or textbooks.

**Downs claims that the forested condition near the incident area would have lowered wind speeds due to surface friction is not accurate due to the configuration of the incident site conditions.**

---

[13] 46/54 x 100
[14] 46/47 x 100
[15] Webber report page 8

Benjamin E. Bryant, Esq.
September 11, 2018
Page 7

Downs claims that the forested condition near the incident area would have lowered wind speeds due to surface friction. That statement is valid where large expanses of trees are located with no opening or breaks.  However, in the case of the incident site, the Connecticut Street Bridge composes a width of bridge supports, four lanes of traffic, and two sidewalks and is surrounded by trees on either side. **(See Photograph 1)**



*Photograph 1 (Source Bing)*

It is has been well researched that when wind travels over treetops and/or other objects, it will drop and accelerate into the opening below (Robertson 1987). It is more likely that wind and rain that occurred over the 6 hour period during this incident that supplied oscillating forces to the trees, that these winds increased in velocity due to site configuration of the bridge to the forested areas alongside (Dunster 2013). Downs report confirms that wind speeds measurements are limited by the fact that they are collected at approximately 33 feet above the ground surface. The fact that winds sustained in this event occurred for approximately 6 hours and increased in speed as they dropped over the trees on to the bridge deck below only further supports that this was an unusual event that caused trees to fail that otherwise would not have.

Therefore, Downs claims that the forested condition near the incident area would have lowered wind speeds due to surface friction is not accurate due to the configuration of the incident site conditions.

**Downs has failed to properly apply the Damage Indicator #27 from the research paper entitled "Recommendation for an Enhanced Fujita Scale"-Texas Tech 2004 and his opinions are not rooted in reliable science and his finding is not valid.**

On page 3 of Downs report, he claims that research conducted by Texas Tech in 2004 applies to the incident tree failures associated with the Hurricane Sandy incident and the facts that surround Walen's injuries. Contrary to the facts and data of the case, he has ignored that the weather conditions reported were from a Hurricane, not a tornado or a thunderstorm event. Furthermore, Downs has failed to consider the plaintiff has failed to accurately identify the tree species, where the tree was prior to the failure, what condition the tree was prior to the incident, the reason why the tree did fail and the fact if the parts that broke and fell on the bridge indeed were what actually caused Walen to be injured. Downs then applied tornado and thunderstorm research to an unknown diameter tree branch to an unknown tree species.

I agree with the Texas Tech research exhibited in both #27 & #28 indicators of damage that structurally sufficient trees will likely fail in conditions that the Enhanced Fujita Scale applies to. However, the Enhanced Fujita Scale applies to tree failure conditions that surround tornados and thunderstorms, not hurricanes. The time frame of measurement for this scale of damage is the top wind speed in a 3-second period.  The research paper entitled "Recommendation for an Enhanced Fujita Scale"-Texas Tech 2004 that Downs relies on states that:

> *Dr. Ted Fujita (1971) developed the Fujita Scale to provide a method to <u>rate the intensity of tornadoes.</u>*

Moreover:

> *The intent of the scale was to distinguish <u>between weak tornadoes and strong tornadoes.</u>*

Moreover, that:

> *The meteorological and engineering communities almost immediately accepted the Fujita Scale.*

Downs is a member of this community, and his CV and his report has demonstrated that he has looked and utilized this research. However, he has failed to apply it correctly. Needless to say, Downs has ignored these teachings.  Downs knew or should have known that this data has no application to the Hurricane Sandy weather that is at the heart of this dispute. He instead misapplied research for Tornado and Thunderstorm damage data that only applies to conditions for the top wind gust measured for a 3 second period. Hurricane Sandy affected conditions around the incident site for approximately 6 hours, not 3 seconds.  Downs failed to follow the same likely teachings and instructions he has revived in his education as a weather spotter, and this is further confirmed in the 2004 Texas Tech document that he claims validates his claim. Texas Tech states:

Benjamin E. Bryant, Esq.
September 11, 2018
Page 9

The National Weather Service (NWS) applies the Fujita Scale in rating tornadoes as they occur. Dr. Fujita's group at the University of Chicago and personnel at the National Severe Storms Forecast Center (NSSFC) independently assigned Fujita Scale ratings to tornadoes in the Historical records based on written descriptions of the damage.

Therefore, Downs has failed to properly apply the Damage Indicator #27 from the research paper entitled "Recommendation for an Enhanced Fujita Scale"-Texas Tech 2004 and his opinion that no wind gust occurred of a magnitude expected to break off large branches from a healthy hardwood tree in full leaf is not a valid finding.

**It is my professional opinion that the findings in my initial report are still valid. I hereby certify that this report is a complete and accurate statement of all my opinions to date and the bases and reasons for them, to which I will testify under oath.**

Respectfully submitted,

_____
Mark A. Webber
BCMA, CPH, LTE, MArborA, OCMNT, TRAQ

Benjamin E. Bryant, Esq.
September 11, 2018
Page 10

**References**

CENTER, NATIONAL CLIMATIC DATA. 1998. *CLIMATIC WIND DATA FOR THE UNITED STATES.* ASHEVILLE, NC: NOAA.

Clanet., E. Virot.A. Ponomarenko. E. Dehandschoewercker. D. Qu´er´ e. C. 2016. "Critical wind speed at which trees break. ." *PHYSICAL REVIEW E 93, 023001 .*

Dunster. 2013. *Tree Risk Assessment .* International Society of Arboriculture.

Leigh, Warren B. 2014. "Low Cycle Fatigue Failure of a Sitka Spruce." *Arboriculture & Urban Forestry* 40(5): 272–285.

Mattheck, C. 2015. *The Body Lauguage of Trees.*

MP., Coutts. 1983. "Root architecture and tree stability." *Plant and Soil.* 71:171–188.

Perry, Karlik . 2008. *EFFECTS OF PRUNING ON WIND-LOADING OF TREES.* ELVINIA J. SLOSSON ENDOWMENT FUND.

Robertson, Alexander. 1987. "THE USE OF TREES TO STUDY WIND." *Arboricultural Journal* 127-143.

Yang, Défossez,Danjon,Fourcaud. 2014. " Tree stability under wind: simulating uprooting with root breakage using a finite element method." *Ann Bot* 114(4): 695–709.