# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

MARY LOU WALEN,

        Plaintiff,

        v.

UNITED STATES OF AMERICA, *et al.*,

        Defendants.

Civil Action No. 15-1718 (BAH)

Chief Judge Beryl A. Howell

## MEMORANDUM OPINION

The plaintiff, Mary Lou Walen, brought this suit under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2674 *et seq.*, and District of Columbia law against the United States and the District of Columbia (the "District") to recover for serious injuries she sustained when a tree limb fell on her as she walked along Connecticut Avenue, a major pedestrian artery in Northwest Washington. *See* Compl. ¶¶ 1–2, 7–8, ECF No. 1. On the day of the plaintiff's injury, Hurricane Sandy ("Sandy") was affecting weather conditions in the District. The plaintiff's complaint alleges that the defendants owed a duty to maintain and inspect the trees overlooking the relevant stretch of Connecticut Avenue, a bridge crossing the Klingle Valley, a wooded depression in Rock Creek Park between the densely populated neighborhoods of Woodley Park and Cleveland Park. *See id.* ¶¶ 19–20, 47–49. She also argues that the defendants' breaches of those duties—and not the storm—caused her injuries. *See id.* ¶¶ 21, 50. She seeks $5,000,000 in compensatory damages, plus reasonable attorneys' fees and costs. *See id.* at 8, 13. Pending are the United States' and District's motions for summary judgment. *See* D.C.'s Mot. Summ. J. ("D.C.'s Mot."), ECF No. 43; U.S.'s Mot. Summ. J. ("U.S.'s Mot."), ECF No. 47. For the reasons that follow, both motions are denied.

# I. BACKGROUND

The factual and procedural background relevant to resolving the pending motions is summarized below.

## A. Factual Background

A tree limb fell on the plaintiff on October 29, 2012, at about 3:15 p.m. as she walked on the sidewalk across the Connecticut Avenue Bridge ("the Bridge"), the portion of Connecticut Avenue that spans the Klingle Valley. *See* United States' Statement of Material Facts Not in Dispute ("U.S.'s SMF") ¶¶ 1–2, ECF No. 47-1, Defendant District of Columbia's Statement of Material Facts Not in Dispute ("D.C.'s SMF") ¶ 17, ECF No. 43-1; Compl. ¶¶ 6–9.[1] She was headed to pick up prescriptions at a pharmacy. *See* U.S.'s Mot., Ex. H, Dep. of Mary Lou Walen ("Pl.'s Dep.") at 33:1 to 33:6, ECF No. 47-10. The plaintiff has lost her memory of the incident, *see id.*, but another person walking on the Bridge at the time "heard a loud crashing sound," "turned toward the sound . . . [,] noticed that a tree branch had fallen," and saw "a few people . . . spinning toward the southwest side of the bridge." Pl.'s D.C. Opp'n, Ex. H, Declaration of Eric Kimbuende ("Kimbuende Decl.") ¶ 4, ECF No. 49-7; *see also* Pl.'s Mem. Opp.'n Def. U.S.'s Mot. Summ. J. ("Pl.'s U.S. Opp'n"), Ex. D, Kimbuende Decl. ¶ 4, ECF No. 50-3. "Upon reaching them," the witness, Eric Kimbuende, "noticed that a woman had been struck by the branch." *Id.*

---

[1] In opposing the motions for summary judgment, the plaintiff, who is represented by counsel, failed to file a "separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated," as is required by the local rules, and thus "[i]n determining [the] motion for summary judgment, the Court may assume that facts identified by the moving party in its statement of material facts are admitted." LCvR 7(h)(1); *see also Grimes v. District of Columbia*, 794 F.3d 83, 96–97 (D.C. Cir. 2015). Nevertheless, here, the citations to the record found in the plaintiff's briefing provided pointers to the disputed facts. *See Burke v. Gould*, 286 F.3d 513, 518–19 (D.C. Cir. 2002) (leaving it to the district court to decide whether to assume facts identified by the moving party are admitted); *accord Arrington v. United States*, 473 F.3d 329, 335 (D.C. Cir. 2006).

The Metropolitan Police Department ("MPD") arrived shortly thereafter, along with emergency medical responders. *See* U.S.'s Mot., Ex. D, Metropolitan Police Dep't, Police Report ("MPD Report") at 2, ECF No. 47-6. The MPD report of the incident stated that the plaintiff "was on the public sidewalk on the west side of the 3200 block of Connecticut [Avenue] NW when she was struck by falling tree limb. When the [responding officer] arrived on the scene, he . . . observed fallen tree limb debris on and around [plaintiff]." *Id.* The plaintiff was transported to George Washington University Hospital "in critical condition" and underwent "emergency surgery." *Id.*

"[T]rees under the maintenance jurisdiction of both" the National Park Service ("NPS"), a federal agency, and the District overhang the Bridge. U.S.'s SMF ¶ 3 (citing U.S.'s Mot., Ex. G, Dep. of Munevver Ertem ("Ertem Dep.") at 9:5 to 10:11, ECF No. 47-9); *see also* Pl.'s Mem. Opp.'n Def. D.C.'s Mot. Summ. J. ("Pl.'s D.C. Opp'n"), Ex. A., Ertem Dep. 9:5 to 10:11, ECF No. 49-3. NPS maintains the trees in Klingle Valley because the Valley is part of a national park, Rock Creek Park. U.S.'s SMF ¶ 2. A former D.C. Department of Transportation ("DDOT") road (now a trail) runs through the Valley, and the District shares with NPS jurisdiction over the trees growing in the now-eroded road and in the road's fifty-foot right of way. Ertem Dep., at 9:5 to 10:11, ECF No. 47-9 and ECF No. 49-3. DDOT does not perform routine inspections of trees in the Klingle Valley, relying instead on resident reports of obtrusive or hazardous trees to trigger inspections and maintenance. *See* D.C.'s Mot., Ex. G., Ertem Dep., at 12:3 to 13:7, 16, ECF No. 43-1. NPS has protocols for routine tree inspections. *See* Pl.'s D.C. Opp'n, Ex. F, Email from Tara Morrison, Superintendent, Rock Creek Park, to Richard Steacy, Advisory Neighborhood Commission (Nov. 20, 2012) at 5, ECF No. 49-3; U.S.'s Mot., Ex. F, Deposition of Donald Kirk ("Kirk Dep.") at 21:3 to 24:24, ECF No. 47-8 (describing how NPS

prioritizes tree maintenance). In the pending motions, NPS's protocols are less at issue than the District's.

A photograph of the Connecticut Avenue Bridge taken two days after the plaintiff was injured, on October 31, 2012, by Diana Bramble, NPS's supervisory horticulturalist for Rock Creek Park, shows a several-foot-long pile of tree debris spanning half the width of the sidewalk. *See* D.C.'s Mot., Ex. H, ECF No. 43-1. Visible atop the pile of debris is a red umbrella, which the plaintiff has identified as her umbrella. Pl.'s D.C. Opp'n, Ex. G, Affidavit of Mary Lou Walen ("Pl.'s Aff.") ¶ 7, ECF No. 49-3; *see also* Pl.'s U.S. Opp'n, Ex. E, Pl.'s Aff. ¶ 7, ECF No. 50-3. Bramble also photographed a tree that had been uprooted at its base on the floor of the Klingle Valley, beneath the Bridge. *See* D.C.'s Mot., Ex. I, ECF No. 1. Bramble testified that she was "of the opinion that the debris on the bridge could possibly be from the large tree that fell," but she could not form a definitive opinion. D.C.'s Mot., Ex. B, Dep. of Diana Bramble ("Bramble Dep.") at 83:14 to 83:16. Kimbuende, the witness, attached to his declaration an image of a tree immediately next to the bridge; the tree is missing a branch, and Kimbuende states "it appears that the tree from which the branch fell is depicted . . . in the image." Kimbuende Decl. at ¶ 9.

The day of the plaintiff's injury, Hurricane Sandy was affecting weather conditions in the District. *See* D.C. SMF ¶¶ 1–10; U.S.'s SMF ¶¶ 7-16, 18; U.S.'s Mot., Ex. A, Nat'l Weather Serv. Nat'l Hurricane Ctr., Tropical Cyclone Report Hurricane Sandy, AL12012, at 3–4, ECF No. 47-3 (describing Sandy's path on October 29); Pl.'s D.C. Opp'n, Ex. C., Nat'l Hurricane Ctr., Sandy Graphics Archive, ECF No. 49-3 (showing Sandy's location 216 miles from D.C. at 2:00 p.m. on October 29); Pl.'s U.S. Opp'n, Ex. B, Nat'l Hurricane Ctr., Sandy Graphics

Archive, ECF No. 50-3 (same as previous);[2] Pl.'s D.C. Opp'n, Ex. E, Thomas E. Downs, Meteorological Assessment Report ("Downs Report") at 2–4, ECF No. 49-3 ("Hurricane Sandy was approaching the East Coast of the United states on October 29, 2012."); *see also* D.C.'s Mot., Ex. L, Downs Report at 2–4, ECF No. 43-1 (same); Pl.'s U.S. Opp'n, Ex. A, Downs Report, ECF No. 50-3 (same). The MPD report noted the weather conditions on the Bridge at the time of the police response as "heavy rain and wind." U.S.'s SMF ¶ 20 (citing MPD Report). The parties dispute the precise weather conditions on the Bridge at the time of the injury. *Compare, e.g.*, Downs Report at 2, *with* U.S.'s SMF ¶¶ 7– 17 (describing the storm).

The following facts about the storm are not contested, however. Three days before the accident, on October 26, 2012, the District's then-Mayor Vincent Gray had declared a State of Emergency "[b]ecause a storm system associated with Hurricane Sandy" was then "rapidly approaching the District" and was "expected to have serious widespread effects in the region." D.C.'s Mot., Ex. A, Mayor's Order 2012-186, "Declaration of Public Emergency," (Oct. 26, 2012) ("D.C. Emergency Declaration"), ECF No. 43-1; *see also* U.S.'s SMF ¶ 10 (citing U.S.'s Mot., Ex. B, D.C. Emergency Declaration, ECF No. 47-4); D.C.'s SMF ¶ 1.[3] At a press conference on October 28, Gray cautioned D.C. residents to "shelter in place during the peak of this storm." U.S.'s SMF ¶ 13 (citing U.S.'s Mot., Ex. C., Press Release, D.C. Multi-Agency, "Mayor Gray Closes District Government Monday," Oct. 28, 2012 ("Press Release"), ECF No. 47-5); *see also* D.C.'s Mot., Ex. F, Tim Craig, *Hurricane Sandy: D.C. Mayor Gray Calls for Immediate Preparations*, The Washington Post (Oct. 28, 2012), ECF No. 43-1 (recounting the

---

[2] The plaintiff also attaches a Latitude/Longitude Calculator showing the measured distance between D.C. and Hurricane Sandy's location on the map in Exhibit C. *See* Pl.'s D.C. Opp'n, Ex. D., Nat'l Hurricane Ctr., Latitude/Longitude Calculator, ECF No. 49-3; Pl.'s U.S. Opp'n, Ex. C, Nat'l Hurricane Ctr., Latitude/Longitude Calculator.

[3] The State of Emergency declared by Mayor Gray ended on November 10, 2012. *See* D.C. Emergency Declaration at 2 (explaining that the order remains in effect for fifteen days following its issuance on October 26).

press conference).[4]  Gray also said that the District "is likely to suffer significant power outages due to fallen trees and other debris."  Press Release.  The District's press release issued about the press conference stated that "the peak of the extreme winds [were] expected between about noon Monday[, October 29] and the early hours of Tuesday morning."  *Id.*

Before her injury, the plaintiff "knew that there was a hurricane coming" on October 29 but was unaware that the Mayor had declared a State of Emergency.  D.C.'s SMF ¶ 18 (quoting D.C.'s Mot., Ex. J, Pl.'s Dep. at 67:6 to 67:23, ECF No. 43-1), ¶ 19 (citing Pl.'s Dep. at 68:16 to 68:21).  When asked if she "recall[ed] if the news said when the hurricane would arrive," the plaintiff responded, "[t]hat evening"—that is, "[t]he evening of the 29th."  *Id.* at 68:23 to 69:9.

NPS facility manager for Rock Creek Park, Donald Kirk, testified that "Hurricane Sandy brought a lot of trees down [in the Park]."  D.C.'s Mot., Ex. C, Kirk Dep. at 44:5 to 44:6, ECF No. 43-1.  Bramble, the NPS horticulturalist, stated that the uprooted tree under the Bridge "appeared to have fallen from the rain and heavy wind."  Bramble Dep. at 101:8–9.  The plaintiff has submitted an expert report by arborist Lew Bloch opining, after reviewing photographs of the tree debris found on the Bridge and other evidence, that the limb on the Bridge "had been dead or dying and decaying" for three to six years and that the limb "was large enough that it should have been evident and discovered during tree risk assessment[s]."  Bloch Report at 2.[5]

---

[4] Also on October 28,  2012, Mayor Gray requested a Presidential Disaster Declaration for D.C., *see* D.C.'s Mot., Ex. D, ECF No. 43-1; *see also* D.C.'s SMF ¶ 7, and the President declared that a major disaster existed in the District on December 5, 2012, *see* D.C.'s Mot., Ex. E, FEMA Disaster Declaration FEMA-4096-DR, ECF No. 43-1; *see also* D.C.'s SMF ¶ 8–9.  These exhibits confirm Hurricane Sandy's "widespread effects in the region."  D.C. Emergency Declaration.

[5] The plaintiff supplemented Bloch's expert report with an affidavit from this same expert.  *See* Pl.'s D.C. Opp'n, Ex. I, Affidavit of Lew Bloch ("Bloch Aff."), ECF No. 49-3; Pl.'s U.S. Opp'n, Ex. F, Bloch Aff.  The District objects that submission of this affidavit is untimely because plaintiff's expert reports were due July 5, 2017 and the affidavit was submitted December 21, 2018.  *See* D.C.'s Reply at 4.  According to the District, the delay in receiving the affidavit was "highly prejudicial," requiring exclusion of the affidavit under Federal Rule of Evidence 37(c)(1), which "provides for the exclusion at trial of any information not disclosed pursuant to Rule 26(a), unless the failure to disclose is harmless, or if there is substantial justification for such failure."  *Halcomb v. Washington Metro. Area Transit Auth.*, 526 F. Supp. 2d 24, 28 (D.D.C. 2007); *see also* FED. R. EVID. 37(c)(1).  The District's

## B. Procedural History

The plaintiff filed this suit in 2015. *See* Compl. at 1. The complaint alleges that D.C. "has a duty to inspect and maintain its roads, sidewalks and trees so as to avoid risk of harm or bodily injury," *id.* ¶ 47, and that the United States "has a duty to inspect and maintain its parks, trees and the surrounding environs so as to avoid the risk of harm or bodily injury," *id.* ¶ 19. The District allegedly breached its duty by "failing to exercise ordinary care in [the] inspection and maintenance of roads, sidewalks and trees," *id.* ¶ 48, and the United States allegedly breached its duty by "failing to exercise ordinary care in its inspection and maintenance of Rock Creek Park and its trees," *id.* ¶ 20. Both defendants, the complaint says, negligently "fail[ed] to remove any and all trees, limbs, branches and/or debris that posed a threat of harm or bodily injury in a timely manner." *Id*. ¶¶ 20 (Count I against United States), 48 (Count V against District).[6] The complaint "requests a trial by jury on all eligible claims." Compl. at 14. By statute, "the court without a jury" is the trier of fact in the action against the United States, 28 U.S.C. § 2402, but the plaintiff's claim against the District is eligible for a jury trial.

The United States' motion to dismiss the claim against it for lack of subject matter jurisdiction, *see* U.S.'s Mot. to Dismiss, ECF No. 14, was denied because the discretionary function exception to the FTCA's waiver of sovereign immunity did not apply when NPS' tree maintenance was governed by federal regulations "prescrib[ing] mandatory conduct for the maintenance, inspection and record-keeping for trees in Rock Creek Park and further, to the extent such actions are discretionary, implementation requires the application of scientific and

---

objection to the affidavit need not be resolved at summary judgment because, for the reasons explained below, Bloch's report is sufficient to withstand summary judgment without the supplemental affidavit.

[6] The complaint also alleges that both defendants "fail[ed] to keep adequate records of inspection and maintenance protocols for trees in [their] control," Compl. ¶ 20, 48, but no reference to this negligent recordkeeping theory appears in the plaintiff's briefs.

professional judgment, not the weighing of policy factors underlying the discretionary function exception," *Walen v. United States*, 246 F. Supp. 3d 449, 457 (D.D.C. 2017).  At the same time, *Walen* dismissed counts of the complaint against several federal agencies, explaining that "the FTCA provides the exclusive remedy for tortious conduct by the United States, which, consequently, is the only properly named [federal] defendant."  *Id*. at 452 n.3.

Discovery then began and, following half a dozen extensions, lasted fifteen months.  *See* Min. Orders (Apr. 18, 2017; May 25, 2018; Sept. 12, 2017; Oct. 5, 2017; Dec. 1, 2017; Jan. 16, 2018; Apr. 13, 2018; May 25, 2018).  The District's and the United States' motions for summary judgment are now ripe for review.

## II.    LEGAL STANDARD

Summary judgment may be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  "Material facts are those that might affect the outcome of the suit under governing law; genuine issues are those in which the evidence before the court is such that a reasonable trier of fact could find for the moving party."  *Hendricks v. Geithner*, 568 F.3d 1008, 1012 (D.C. Cir. 2009); *see also Arrington*, 473 F.3d at 333 ("A dispute over a material fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  The burden is on the moving party to demonstrate that there is an "absence of a genuine issue of material fact" in dispute.  *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323 (1986); *Hendricks*, 568 F.3d at 1012.

In determining whether there is a genuine dispute for trial, a court must "view the evidence in the light most favorable to [the non-moving party], draw all reasonable inferences in [that party's] favor, and may not 'make credibility determinations or weigh the evidence.'"

*Iyoha v. Architect of the Capitol*, 927 F.3d 561, 565 (D.C. Cir. 2019) (quoting *DeJesus v. WP Co.*, 841 F.3d 527, 531 (D.C. Cir. 2016)). In the end, "a movant is entitled to summary judgment when, drawing all inferences in favor of the non-movant, a reasonable jury could not return a verdict in the non-movant's favor." *Davis v. District of Columbia*, 925 F.3d 1240, 1248 (D.C. Cir. 2019) (citing *Celotex*, 477 U.S. at 326–27; *Anderson*, 477 U.S. at 248).

## III.  DISCUSSION

The District and the United States move separately for summary judgment on multiple, and overlapping, grounds. *See* D.C.'s Mem. Supp. Mot. Summ. J. ("D.C.'s Mem.") at 1–2, ECF No. 43; U.S.'s Mem. Supp. Mot. Summ. J. ("U.S.'s Mem.") at 1–2, ECF No. 47-2. To preview, the District seeks summary judgment on three grounds: sovereign immunity, *see* D.C.'s Mem. at 10; the insufficiency of the plaintiff's expert report to carry the plaintiff's burden under D.C. law to demonstrate the applicable standard of care, *see id.* at 14–21; and the operation of complete defenses, including contributory negligence, assumption of risk, and act of God, D.C.'s Mem. at 9, 22–26. The United States' motion builds on two of the District's arguments, also attacking the plaintiff's expert report and raising the defense of contributory negligence. *See* U.S.'s Mem. Supp. Mot. Summ. J. ("U.S.'s Mem.") at 1–2, 8–12, 15, ECF No. 47-2.

Each of the defendants' arguments is addressed in turn, with each applicable standard of review presented before the analysis, starting with the District's motion.

### A.  The District's Motion for Summary Judgment

#### 1.  *Sovereign Immunity*

##### a)  *Applicable Legal Principles*

The District asserts that sovereign immunity bars the claim against it because "the District is immune from suit in tort if the act complained of was committed in the exercise of a discretionary function," *D.C. Hous. Auth*. v. *Pinkney*, 970 A.2d 854, 859 (D.C. 2009), and the

District classifies the "tree inspection and removal program []as discretionary in nature," D.C.'s Mem. at 10. The District acknowledges, *id.*, that no immunity from suit is provided "where the District's conduct arises out of the exercise of ministerial powers" for which "there is a duty to act in a reasonably safe and skillful manner," *Pinkney*, 970 A.2d at 859 (quoting *District of Columbia v. Pace*, 498 A.2d 226, 228 (D.C. 1985)); *accord Nealon v. District of Columbia*, 669 A.2d 685, 690 (D.C. 1995). "The determination of whether a governmental function is discretionary or ministerial is one of law to be made by the trial judge," *Aguehounde v. District of Columbia*, 666 A.2d 443, 445 n.3 (D.C. 1995), and D.C. law places on the District the burden of demonstrating that the function at issue in a suit is discretionary, *see Barnhardt v. District of Columbia*, 8 A.3d 1206, 1214 (citing *Aguehounde*, 666 A.2d at 445 n.2).

The question of whether an action is discretionary "goes beyond whether the act entailed a choice among alternatives. It seeks to ascertain whether the governmental action . . . allows significant enough application of choice to justify official immunity, in order to ensure fearless, vigorous and effective decision making." *Casco Marina Dev., L.L.C. v. D.C. Redevelopment Land Agency*, 834 A.2d 77, 81 (D.C. 2003) (quoting *Moss v. Stockard,* 580 A.2d 1011, 1020 (D.C.1990)). The general rule is that "discretionary acts involve the formulation of policy, while ministerial acts involve the execution of policy." *Pinkney*, 970 A.2d at 860 (quoting *Nealon*, 669 A.2d at 690)). "Discretionary acts have also been defined as acts that require personal deliberation, decision and judgment. They generally have a broad public effect and call for a delicate balancing of competing considerations." *Nealon*, 669 A.2d at 690 (internal quotation marks and citation omitted). "[M]inisterial acts require little or no judgment, and generally constitute 'mere obedience to orders or performance of a duty in which the [municipal employee]

has little or no choice.'" *Id.* (alteration in original) (quoting 18 E. McQuillin, MUNICIPAL CORPORATIONS § 53.22.10 (3d ed. 1984)).

These definitions of discretionary and ministerial conduct under D.C. law have developed greater concreteness in cases brought by plaintiffs injured on public roads and streets.[7]  On the one hand, roadway "planning and design are discretionary functions." *Pace*, 498 A.2d at 229 (citing *Johnston v. District of Columbia*, 118 U.S. 19, 20–21 (1886); *District of Columbia v. North Washington Neighbors, Inc.*, 367 A.2d 143, 148 n.7 (1976), *cert. denied*, 434 U.S. 823 (1977)).  Thus, the District has been granted immunity from legal challenges to "the placement of traffic control devices," *Pace*, 498 A.2d at 229 (discussing *Urow v. District of Columbia*, 316 F.2d 351 (D.C. Cir.) (per curiam), *cert. denied*, 375 U.S. 826 (1963)), and "bus stops," *McKethean*, 588 A.2d at 715; the "setting of yellow intervals" for traffic lights, *Aguehounde*, 666 A.2d at 451; as well as "freeway improvements," *Pace*, 498 A.2d at 229.  What these discretionary, roadway-related functions have in common is that they are "complex, involving the consideration of many competing factors and large expenditures of scarce resources," *id.*, and so "[t]here is no reason to believe that the laymen on a jury are better qualified than the District's experts to render a decision on those matters," *id.* at 230; *see also*, *e.g.*, *Urow*, 316 F.2d at 352 (calling a city's "general traffic control plan" "discretionary" and "quasi-legislative").

On the other hand, "the District does have a ministerial duty to maintain its streets and highways," *Pace*, 498 A.2d at 230, where "maintenance means keeping the roadway and its physical appurtenances in good condition, according to their original design," *id.* at 231 (citing

---

[7] In briefing whether the function at issue is discretionary, the plaintiff invokes primarily federal cases defining the scope of the United States' immunity under the FTCA. *See* Pl.'s D.C. Opp'n at 13–16.  The FTCA, like D.C. law, has a "discretionary function" exception, and D.C. courts occasionally rely on federal cases in developing D.C. law. *See, e.g.*, *Aguehounde*, 666 A.2d at 448; *McKethean v. WMATA*, 588 A.2d 708, 715 (D.C. 1991).  No D.C. case suggests that D.C. law and the FTCA are coterminous on this point, however.

*Wagshal* v. *District of Columbia*, 216 A.2d 172, 172–74 (D.C. 1966); *District of Columbia v. Freeman,* 477 A.2d 713, 715 (D.C. 1984)); *see also Wagshal*, 216 A.2d at 173 ("[I]t is well established that an exception to the doctrine of sovereign immunity is the District's obligation to maintain the streets in a reasonably safe condition for travel." (citing *Urow*, 316 F.2d 351; *Booth v. District of Columbia*, 241 F.2d 437 (D.C. Cir. 1956); *District of Columbia v. Caton*, 48 App. D.C. 96 (1918)).

This distinction—between the discretionary functions of planning and design and the ministerial function of maintenance—is rooted in over a century of case law defining the scope of the District's "duty . . . to maintain its streets 'in a condition fit for convenient use and safe against accident to travelers using them.'" *Husovsky v. United States*, 590 F.2d 944, 950 (D.C. Cir. 1978) (quoting *District of Columbia v. Woodbury*, 136 U.S. 450, 463 (1890)); *see also Urow*, 316 F.2d at 352 (calling this duty an "exception to the general rule of municipal immunity with regard to the obligation to keep streets in a safe condition after being put on notice of a defect").[8]  For example, in 1886, in *Johnston v. District of Columbia*, 118 U.S. 19 (1886), the Supreme Court explained that the District's decisions about the planning and design of its sewer system were discretionary but "for any negligence in . . . keeping [the sewer] in repair, . . . the municipality . . . may be sued." *Id.* at 21.  D.C.'s Court of Appeals has relied on cases like *Johnston* in defining the scope of modern-day sovereign immunity. *See Pace*, 498 A.2d at 230–31 (relying on such cases); *Wagshal*, 216 A.2d at 173 (same).

---

[8] This duty applies not just to the District but to many municipalities.  *See* McQuillin, *supra*, § 54.5 ("Generally concerning public ways, the judicial decisions or statutes have established and imposed these obligations upon the municipal authorities: . . . [streets] must at all times be kept in proper repair or in a reasonably safe condition insofar as may be by the exercise of ordinary diligence and continuous supervision . . . .  The deeming of the performance of these obligations not as a governmental duty but as a private or proprietary duty, such as a ministerial function relating to corporate interests only, constitutes the reason, in some decisions, for imposing municipal liability for injuries arising from defective public ways.").

b) *The District's Claim to Immunity from this Suit*

As noted, the District claims immunity from this suit "[b]ecause the District's tree inspection policy is discretionary." D.C.'s Mem. at 13. Relying on deposition testimony by DDOT Urban Forestry employee Munevver Ertem, the District defines this "tree inspection and removal protocol" as a policy of "rel[ying] on resident reports and complaints" about dangerous trees rather than "perform[ing] routine inspections of trees in the Klingle Valley." D.C.'s Mem. at 11 (citing Ertem Dep. at 12:3, 12:24 to 13:1; 16:8 to 16:10, ECF No. 43-1).[9] In response to a question whether the District had "any policies or procedures regarding routine inspections of the [Connecticut Avenue] Bridge," Ertem testified: "Routine inspections, no." Ertem Dep. at 12:3–6, ECF No. 43-1. Ertem further explained that "[r]esidents or anybody can request an inspection," *id.* at 12:24–25, and that after "there [has been] an inspection request," a "picture[] of the roadway[]" may be taken, *id.* at 16:5–10. Further, a DDOT inspection that reveals a hazard could presumably lead to action to remedy that hazard. *See id.* at 16:21–25 (suggesting that trees along roadways are sometimes trimmed). The District argues that the development and application of its "tree inspection policy is discretionary," D.C.'s Mem. at 13, likening that policy to the formulation and implementation of a "plan of improvement" for a freeway, a function the D.C. Court of Appeals deemed discretionary in *Pace*, D.C.'s Mem. at 12 (quoting *Pace*, 498 A.2d at 229–30).[10]

---

[9] The plaintiff argues that "the evidence suggests that DDOT's Urban Forestry Division works concurrently with NPS to remove trees within their concurrent jurisdiction" so that DDOT should be viewed as having the same tree inspection policy as NPS. Pl.'s Opp'n at 14-15 (citing Ertem Dep. at 9:14 to 9:25, ECF No.49-2; Bramble Dep. at 37:16 to 38:10). The two portions of the record cited by the plaintiff do not establish, however, that the District follows NPS's protocol. The cited portion of the Ertem Deposition merely delineates the District's and NPS's jurisdiction and the cited portion of the Bramble deposition cannot be reviewed as this portion was not submitted as an exhibit by any party.

[10] Elsewhere, D.C. attempts to frame the function at issue as isolated from DDOT's management of the roads. *See, e.g.*, D.C.'s Mem. at 12 (defining the function at issue without mentioning roads or sidewalks). Yet Ertem's testimony makes clear that DDOT's tree inspection work cannot be so isolated. DDOT only inspects trees when those trees interact with the "*roadways*"—"We take pictures of the roadways," Ertem stated. Ertem Dep. at 16:15, ECF No. 43-1. The District later recognizes that the "issue of discretionary immunity" could be "control[led]

The Ertem deposition testimony relied on by the District, *see* D.C.'s Mem. at 11 (citing Ertem Dep. at 12:3; 12:2 -13:1; 16:8-16:10, ECF No. 43-1), defeats this analogy. *Pace* deemed decisions about whether to make highway improvements discretionary because:

> To hold otherwise would be effectively to impose a legal duty on the District to have "state-of-the-art" streets. . . . The implementation of evolving engineering standards is costly, requiring the allocation of limited governmental funds through a system of priorities. . . . Further, long-term planning in this area is essential but would be thwarted entirely if it became the frequent subject of litigation.

*Id.* The function, as described by Ertem, of inspecting and maintaining trees overhanging a long-existing, major roadway is not similarly complex, specialized, or potentially frustrating to municipal long-term planning.[11]

To the contrary, the conduct described by Ertem fits naturally into D.C. law's definition of ministerial road maintenance: "keeping the roadway and its physical appurtenances in good condition, according to their original design." *Pace*, 498 A.2d at 230. Analogy to a clear case of road maintenance illustrates this. In *Wagshal*, a motorist sued the District claiming that a downed stop sign had caused an accident in which he was injured. 216 A.2d at 173. The D.C. Court of Appeals reasoned that the District would be immune from suit "for its failure to *establish* a traffic control device at an intersection" and that D.C. "need not have put up the sign" at issue "but [that] once it did, it had a duty to maintain it properly in order to keep the intersection reasonably safe for motorists," and could be sued for breach of that ministerial duty.

_____

here" by the District's "duty 'to use reasonable diligence to protect motorists [and pedestrians near] . . . Klingle Road," and indeed all other roads, "from hazards posed by the land.'" D.C. Reply at 10 (quoting *Husovsky*, 590 F.2d at 953).

[11] The other cases cited by the District do not help its claim of immunity. *Nealon*, 669 A.2d at 691, and *Chandler v. District of Columbia*, 404 A.2d 964 (D.C. 1979), are both inapposite because they deal with fire protection, and the law is well-established that "[a] municipality's decision regarding fire protection is protected from liability," *Nealon*, 669 A.2d at 691 (citing *Chandler*, 404 A.2d at 966). Another case, *Morgan v. District of Columbia*, 468 A.2d 1306, 1311 (D.C. 1983), also deals with a special rule of tort liability, the public duty doctrine, which is not at issue in this case.

*Id.* at 174. The District is similarly not immune here, where the plaintiff claims not that the District was negligent in its planning or design of the Connecticut Avenue Bridge but that the District allowed a dangerous roadway condition to arise through negligence.

The District argues that the "formulat[ion] of the notice and inspection policy" was discretionary because it involved weighing "such concerns as cost and the allocation of staff and other resources." D.C.'s Mem. at 11–12. Merely because conduct requires the allocation of limited monetary or human resources does not make that conduct the exercise of a discretionary function, however. *See, e.g., Cope v. Scott*, 45 F.3d 445, 449 (D.C. Cir. 1995) ("Budgetary constraints . . . underlie virtually all government activity." (quoting *ARA Leisure Servs. v. United States*, 831 F.2d 193, 196 (9th Cir. 1987)). In *Pinkney*, for example, the D.C. Housing Authority ("DCHA") asserted that elevator replacement and maintenance in DCHA housing was discretionary because it involved "budget-driven policy decision[s]," but the D.C. Court of Appeals was unconvinced that this function "imposes upon [DCHA] determinations of such delicacy and difficulty that its ability to furnish public [housing] will be ponderably impaired by liability for neglect in failing to make such repairs." 970 A. 2d at 862 (quoting *Elgin v. District of Columbia*, 337 F.2d 152, 156–57 (D.C. Cir. 1964)). The same is true here: as already explained, the District has long operated under a "duty . . . to maintain its streets 'in a condition fit for convenient use and safe against accident to travelers using them.'" *Husovsky*, 590 F.2d at 950 (quoting *Woodbury*, 136 U.S. at 463); *see also e.g.*, *Wagshal*, 216 A.2d at 173 ("And whether it be called governmental or ministerial, it is well established that an exception to the doctrine of sovereign immunity is the District's obligation to maintain the streets in a reasonably safe condition for travel.").

Finally, the District insists that this duty cannot "control[] here regarding the issue of discretionary immunity," D.C.'s Reply at 10, but points to reasons that go not to sovereign immunity but to the sufficiency of the plaintiff's evidence. As support, the District says that the plaintiff's expert arborist report is inadequate to "show that the District deviated from a duty of 'reasonable diligence,' or that its partial reliance on the United States to remove problem trees from the Klingle Valley was unreasonable." *Id.* The sufficiency of the plaintiff's expert arborist report, by Lew Bloch, is taken up next, and again with the United States' motion.

## 2. *Bloch's Expert Report*

### a) *Legal Principles Relevant to the Sufficiency of Bloch's Report*

"The plaintiff in a negligence action bears the burden of proof on three issues: 'the applicable standard of care, a deviation from that standard by the defendant, and a causal relationship between that deviation and the plaintiff's injury.'" *Toy v. District of Columbia*, 549 A.2d 1, 6 (D.C. 1988) (quoting *Meek v. Shepard*, 484 A.2d 579, 581 (D.C. 1984)). Under D.C. law, "[a] plaintiff must put on expert testimony to establish what the standard of care is if the subject in question is so distinctly related to some science, profession or occupation as to be beyond the ken of the average person." *District of Columbia v. Arnold & Porter*, 756 A.2d 427, 433 (D.C. 2000) (quoting *Messina v. District of Columbia*, 663 A.2d 535, 538 (D.C. 1995)); *accord, e.g.*, *Varner v. D.C.*, 891 A.2d 260, 267 (D.C. 2006); *see also Briggs v. WMATA.*, 481 F.3d 839, 845 (D.C. Cir. 2007) (collecting examples). Consequently, allegations of negligent maintenance of trees must be supported by expert testimony. *Briggs*, 481 F.3d at 845 (discussing *Katkish v. District of Columbia*, 763 A.2d 703, 706 (D.C. 2000) (requiring expert testimony to establish when the condition of a "tree may create a dangerous situation requiring a[] . . . response and whether the likelihood of the tree falling is related to the condition of the tree, the

street, or other circumstances," *Katkish*, 763 A.2d at 706). The parties thus agree "that this matter requires expert testimony demonstrating the applicable standard of care." Pl.'s Opp.'n at 16; *see also* D.C.'s Mem. at 14–15; U.S.'s Mem. at 13.

At trial, expert testimony on standard of care must identify a "concrete standard upon which a finding of negligence could be based." *District of Columbia v. Carmichael*, 577 A.2d 312, 315 (D.C. 1990). "[G]eneralized references" to standards are insufficient. *District of Columbia v. Moreno*, 647 A.2d 396, 400 (D.C. 1994); *see also Phillips v. District of Columbia*, 714 A.2d 768, 773 (D.C. 1988) ("[T]he expert must testify as to *specific* . . . standards."). This means, as the D.C. Circuit has explained, that, under D.C. law, an expert's trial testimony "is not sufficient if it consists merely of the expert's opinion as to what he or she would do under similar circumstances," or if "the expert simply . . . declare[s] that the [defendant] violated the national standard of care." *Briggs*, 481 F.3d at 846 (third alteration in original) (quoting *Clark v. District of Columbia*, 708 A.2d 632, 635 (D.C. 1997)). "Rather, the expert must clearly articulate and reference a standard of care by which the defendant's actions can be measured" and "clearly relate the standard of care to the practices in fact generally followed by other comparable . . . facilities or to some standard nationally recognized by such units." *Id.*; *see also, e.g.*, *Travers v. District of Columbia*, 672 A.2d 566, 569 (D.C. 1996) (requiring "evidence that a particular [standard] is followed nationally").

The procedural posture of the litigation at the time of assessing the sufficiency of the expert's articulation of the standard of care is significant. "[C]ourts have recognized that there is a lower standard for an expert's identification of a national standard of care when considered at the summary judgment stage than when the expert's testimony is considered in the directed verdict context, after the expert has testified." *Pauline v. United States*, 962 F. Supp. 2d 301,

303 (D.D.C. 2013); *see also Liser v. Smith*, 254 F. Supp. 2d 89, 103–04 (D.D.C. 2003); *Robinson v. WMATA*, 858 F. Supp. 2d 33, 41 n.7 (D.D.C. 2012). Accordingly, at summary judgment, "the plaintiff's experts must assert only 'a colorable basis to believe that [the expert's] testimony may satisfy' the standard for identifying the national standards of care and linking an expert's opinion to them." *Pauline*, 962 F. Supp. 2d at 303 (quoting *Liser*, 254 F. Supp. at 103–04); *see also Snyder v. George Washington Univ.*, 890 A.2d 237, 246 (D.C. 2006) (deeming expert report sufficient at summary judgment because it "reflected evidence of a national standard and was 'not . . . based upon [his own] personal opinion, nor mere speculation or conjecture'" (quoting *Hawes v. Chua*, 769 A.2d 797, 806 (D.C. 2001)); *Pannell v. District of Columbia*, 829 A.2d 474, 479 (D.C. 2003) (stating that report "was insufficient to withstand . . . summary judgment" where expert witness "failed to offer any support for his conclusion that the District violated a national standard of care"); *Varner*, 891 A.2d at 269 (rejecting expert testimony at summary judgment because "[o]ther than his own personal opinion," the expert was "unable to suggest any recognized standard, written or oral, which addressed the" standard of care).

        *b)*     *Sufficiency of Bloch's Report*

Lew Bloch, the plaintiff's expert arborist, reviewed "color photographs" of a fallen tree on the Connecticut Avenue Bridge, NPS documents "related to tree management," an email exchange between the Superintendent of Rock Creek Park and a member of the area Advisory Neighborhood Commission, as well as the MPD report about the incident that injured plaintiff. *See* Bloch Report at 2, 4–12. Based on NPS "documents" (naming "[t]heir A-123 Internal Control Assessment Program and Tree Management Action Plan") and based on statements by the Superintendent in the emails, Bloch concludes that "regular inspections are required by NPS"—"monthly drive-by inspections for primary roads, bi-annual walk through inspections for all other areas by trained tree care professionals." Bloch Report at 2. Bloch adds that the

documents state that these inspections are required to "maintain[] safety of the public from hazardous trees." *Id.* In Bloch's "professional opinion," the limb in the images he reviewed "had been dead or dying and decaying" for three to six years and the limb "was large enough that it should have been evident and discovered during tree risk assessment[s]." *Id.* Explaining this opinion, Bloch reports that the "pieces" of the fallen limb on the sidewalk "were so brittle and decayed that they shattered when they landed. If this had been a live limb that fell, it would not have broken up in such small pieces." *Id.* The report finally certifies that Bloch's "opinions and conclusions were developed, and this report prepared in conformity with standard arboricultural practices, and my expertise as a consulting arborist." *Id.* at 3.

Whether Bloch's current report would satisfy the standard for expert trial testimony is not at issue here. As already explained, at this stage, the standard that Bloch's report must meet is a less demanding one. Bloch's report survives because the standard of care articulated there is neither overly general nor dependent on totally baseless assertions. The cases applying D.C.'s expert testimony requirement at the summary judgment stage emphasize that those are the two flaws that can be fatal. *See Liser*, 254 F. Supp. 2d at 103 ("[T]his is not a situation where the expert's reports . . . are completely devoid of any reference to concrete and specific standards or practices."). In *Briggs*, for example, the D.C. Circuit, applying D.C. law, rejected expert testimony because it was "both too general and too vague to satisfy the requirements of D.C. law." 481 F.3d at 846. In the cases in which the D.C. Court of Appeals has rejected, at summary judgment, expert testimony establishing the standard of care, the experts offered either no opinion about the relevant standard or no basis for their opinion. In one, the expert, at his first deposition, testified that he had no "opinion as to whether" certain defendants "met the national standard of care" and, at his second deposition, "failed to offer any support for his conclusion

that the District violated a national standard of care." *Pannell*, 829 A.2d at 479.  In another,

"[o]ther than his own personal opinion," the expert was "unable to suggest any recognized

standard, written or oral, which addressed the question" of standard of care.  *Varner*, 891 A.2d at

269.[12]  In contrast, when viewed in the light most favorable to the plaintiff, the specifics in

Bloch's report describing the frequency and nature of inspections required by NPS and the

appearance and size of the limb indicate that Bloch may, at trial, provide a non-expert trier of

fact with a concrete, specific standard of care regarding tree inspections and what such

inspections should have identified.

The District criticizes Bloch's report for making "no mention of the District or DDOT at

all," D.C.'s Mem. at 17; *see also* D.C.'s Reply at 5, but that omission is not fatal to plaintiff's

claim against the District.  No legal authority is cited by the District requiring that each

defendant must be mentioned in an expert report establishing the relevant standard of care.

Further, the D.C. law is clear that "an expert may support a purported standard by showing that it

has been accepted as controlling in facilities and enterprises that are similar to defendants'

facilities or enterprises." *Briggs*, 481 F.3d at 847 (citing *Clark*, 708 A.2d at 635; *Messina*, 663

A2d at 539; *Toy*, 549 A.2d at 8); *cf. Snyder*, 890 A.2d 237 ("The fact that [the expert] did not

expressly use the words 'national standard' when stating his expert opinion does not, in itself,

render his opinion inadmissible.").  Given this, Bloch's report satisfies the threshold for

sufficiency at summary judgment by analyzing the tree protocols of similar "facilities or

enterprises," like NPS.  Finally, Bloch's opinion is that the tree limb would not have fallen on the

plaintiff had tree inspections of the sort described in the NPS protocols occurred.  The logic of

that conclusion does not depend on an analysis of DDOT's policies.  *See Liser*, 254 F. Supp. 2d

---

[12] The third case is one in which the plaintiff had failed to offer any expert testimony at all.  *See Jones v. Nat'l R.R. Passenger Corp.*, 942 A.2d 1103, 1108 (D.C. 2008).

at 103 (deeming sufficient to survive summary judgment an expert report asserting that the plaintiff's injury would have been avoided had investigators followed "the standard of care delineated" in the expert report).

The District argues at length, yet without citation to any legal authority, that Bloch's report has "fatal flaws" in its factual bases and that those flaws require his testimony to be excluded from trial. Specifically, the District faults Bloch's report as based on "photographs taken after Plaintiff was removed from the accident showing (a) tree parts, and (b) a tree that has a missing limb," contending this "is simply not enough to establish that the tree with the missing limb shed a limb that struck Plaintiff." D.C.'s Mem. at 21. Additional faults cited by the District are that Bloch failed "to supply the 'whys and wherefores' for his opinions," to "consider the deposition testimony taken during discovery," or "to explain why he believes that the debris on the bridge shows the tree that struck Plaintiff." *Id*. The United States raises overlapping objections supplemented with legal citations, so these objections are addressed with the United States' motion. *See infra* in Part III.B.1. As explained there, Bloch's testimony meets the basic threshold for admissibility, so these objections must be assessed at a later stage. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596 (1993) ("[V]igorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence"); *Ambrosini v. Labarraque*, 101 F.3d 129, 138, 141 (D.C. Cir. 1996) (explaining that "credibility" and "persuasiveness" are not "gatekeeper" issues but rather issues of "the weight appropriately to be accorded such testimony by a fact finder").

### 3.    *Defenses*

The District raises three defenses, any of which, if successful, would bar the plaintiff's claim.  As discussed next, however, issues of material fact preclude summary judgment for the District on any of these defenses.

#### a)    *Act of God Defense*

"An Act of God is the result of the direct, immediate and exclusive operation of the forces of nature, uncontrolled or uninfluenced by the power of man and without human intervention, and is of such character that it could not have been prevented or avoided by foresight or prudence."  *Watts v. Smith*, 226 A.2d 160, 162 (D.C. 1967).  "Extraordinary floods, storms of unusual violence, sudden tempests, severe frosts, great droughts, lightnings, earthquakes, sudden deaths and illnesses, have been held to be 'acts of God.'"  *Gleeson v. Va. Midland Ry. Co.*, 140 U.S. 435, 439 (1891).  Ordinary storms and typical rainfall are not acts of God.  *Shea-S&M Ball v. Massman-Kiewit-Early*, 606 F.2d 1245, 1249 (D.C. Cir. 1979) ("Heavy rainfalls, unless they are unusual and extraordinary, are not considered acts of God.").  "[H]uman intervention" or contribution bars an act of God defense "when the effect, the cause of which is to be considered, is found to be in part the result of the participation of man, whether it be from active intervention or neglect."  *Fred Drew Constr. Co. v. Mire,* 89 A.2d 634, 636 (D.C. Cir. 1952).

To prevail on summary judgment on an act of God defense, then, the District must show that, as a matter of law, an exceptional or extraordinary natural phenomenon, absent human contribution, caused the plaintiff's injury.  The District argues that the undisputed facts establish (1) that Hurricane Sandy was such a phenomenon, *see* D.C.'s Mem. at 4–7, and (2) that "[t]he District did not contribute to Plaintiff's injury," D.C.'s Mem. at 7.  Genuine issues for trial are present as to both prongs necessary to sustain this act of God defense.

First, and briefly, the District's act of God defense fails because it cannot be said on this record that, as a matter of law, "human intervention"—relevantly, negligence by the District— contributed not at all to the limb's fall. Contrary to the District's position that "there is no competent evidence in the record in this case that indicates negligence by the District in the maintenance or inspection of the tree that struck Plaintiff," D.C.'s Mem. 7, Bloch's expert report opines that the limb would not have fallen but for negligence by a human actor, *see* Bloch Report at 2–3.

Second, and more importantly, a clear factual dispute is presented over whether the weather conditions at the time of the plaintiff's injury were "extraordinary" or "unusual[ly] violent." *Gleeson*, 140 U.S. at 439. The plaintiff retained a meteorological expert, Thomas Downs, who concluded: "To a reasonable degree of meteorological certainty, at the subject [Bridge] and at the time of the incident, October 29, 2012 at about 3:15 p.m., skies were overcast, rain was falling with a temperature of around 52°F and the wind was out of the northwest around 28 mph with gusts up to 40 mph." Downs Report at 1. News-outlet weather reports offered by the District help contextualize Downs' findings. One describes "[w]inds . . . sustained at around 20 mph, with some gusts over 30 mph" as "not too bad." D.C.'s Mem. at 6 (quoting Dan Stillman, *D.C. area forecast,* The Washington Post (October 29, 2012), https://www.washingtonpost.com/blogs/capital-weather-gang/post/dc-area-forecast-sandy-power-slams-the-nations-capital-downed-trees-dangerous-travel-conditions-and-power-outages-imminent/2012/10/29/644231ce-216d-11e2-ac85-e669876c6a24_blog.html?utm_term= .bfeb6a02eee7). Another states that, later in the day, "as we get toward sunset, there is a good chance for at least areas of sustained winds near or above tropical storm force, with gusts potentially approaching 70-80 mph." *Id.* (quoting Ian Livingston, *Winds increasing in D.C. area*

*as Sandy approaches, worst arrives around evening*, The Washington Post (October 29, 2012),

https://www.washingtonpost. com/blogs/capital-weather-gang/post/winds-increasing-in-dc-area-

as-sandy-approaches-worst-arrives-around-evening/2012/10/29/dc9302cc-21e8-11e2-ac85-

e669876c6a24_blog.html?utm_term=.8fe6dda21c07 ("Livingston Blog Post")).[13]

The District disputes Downs' conclusion by pointing to two types of evidence: (1) Mayor

Gray's declaration of a State of Emergency on October 26 and Gray's request to the President for

a Presidential Disaster declaration, D.C. Mem. at 5; and (2) weather predictions and post-storm

reports from the *Washington Post*'s meteorologists, *id*. at 4–7.[14]  As to the latter evidence, for

example, the District notes that, about two hours before the plaintiff's injury, at 1:17 PM, a

meteorologist at the *Washington Post* blogged: "Winds across D.C. area are currently sustained

in the 25 to 35 mph range, with gusts near and past 40 mph." *Id.* at 6 (quoting Livingston Blog

Post).[15]  After the storm, the *Washington Post* reported that wind gusts on October 29 had peaked

at 55-65 mph and that 3.85" of rain had fallen, "a precipitation record for that day of the year."

*Id.* at 7 (citing Jason Samenow, *Was Hurricane Sandy well-forecast?,* The Washington Post

(October 30, 2012), https://www.washingtonpost.com/blogs/capital-weather-gang/post/was-

---

[13] The District does not challenge Downs' meteorological findings, but argues that "[d]ata provided by . . . Downs . . . totally contradicts Plaintiff's argument that Plaintiff chose to walk outside during a period of 'average rainfall and wind speed,' or that 'the storm had not actually begun to manifest in the D.C. area at the time of Plaintiff's injury.'"  D.C. Reply at 8.  The proper interpretation of the data provided by Downs is a dispute for trial. *See, e.g., Heller v. District of Columbia*, 952 F. Supp. 2d 133, 142 (D.D.C. 2013) (explaining that "concerns about the conclusions" of experts are issues for trial and collecting cases).

[14] The District also challenges Downs' different conclusion that the winds at around 3:15 pm were below or "near the lower bound of" the threshold at which "healthy tree[]" branches would be expected to break from wind damage.  Downs Report at 4.  D.C. objects first that "Downs is not qualified to opine on the impact of sustained high winds on trees," D.C. Reply at 8, and second that this conclusion is incorrect, based on the report of the District's own expert arborist, s*ee* D.C.'s Reply at 8 (citing Attachment A, Expert Rebuttal Report by Mark Webber, ECF No. 53).  Even if this challenged conclusion by Downs is not considered, however, the plaintiff's claims survive summary judgment.  Thus, the District's objections to Downs' conclusion about the health of the broken tree need not be resolved at this stage.

[15] The District also cites a webpage showing that, at 2:52 p.m., Ronald Reagan Washington National Airport's weather station reported 23 mph sustained wind and 45 mph gusts.  *See* Weather Underground, *Ronald Reagan Washington National, VA: Daily Observations* (October 29, 2012), https://www.wunderground.com/history/ daily/KDCA/date/2012-1029?req_city=Washington&req_state=DC&req_ statename=District%20of%20Columbia &reqdb.zip=20008&reqdb.magic=1&reqdb.wmo=99999.

hurricane-sandy-well-forecast-was-it-over-hyped/2012/10/30/67075e52-22c1-11e2-ac85-

e669876c6a24_blog.html?utm_term=.c19039715898; Justin Greiser, *Hurricane Sandy recap:*

*Historic storm from storm surge to snow,* The Washington Post (October 31, 2012),

https://www.washingtonpost.com/blogs/capital-weather-gang/post/hurricane-sandy-recap-

historic-storm-from-storm-surge-to-snow/2012/10/31/9a7c56d8-2362-11e2-ac85-

e669876c6a24_blog.html)).  This dueling evidence creates a dispute, one which must be resolved

by a trier of fact, about whether the weather conditions at the time were "extraordinary and

unusual" enough to qualify those conditions as an act of God.  *Shea-S&M Ball*, 606 F.2d at 1249.

The same factual dispute precludes summary judgment for the District on its contributory

negligence defense.

> b)    *Contributory Negligence*

Contributory negligence is "the failure to act with the prudence demanded of an ordinary

reasonable person under like circumstances."  *Stager v. Schneider*, 494 A.2d 1307, 1311 (D.C.

1985).  In D.C., when a plaintiff's contributory negligence is a "factor" contributing to the

plaintiff's injury, the plaintiff may not recover at all against the defendant.  *George Washington*

*Univ. v. Waas*, 648 A. 2d 178, 180 (D.C. 1994) (quoting *Sinai*, 498 A.2d at 528); *see also, e.g.,*

*Andrews v. Wilkins*, 934 F.2d 1267, 1272 (D.C. Cir. 1991).[16]  This is true "even if the defendant

was also negligent."  *Sinai*, 498 A.2d at 528.  "A party asserting the defense of contributory

negligence is required to establish, by a preponderance of the evidence, that the plaintiff failed to

exercise reasonable care," *Poyner v. Loftus*, 694 A.2d 69, 71 (D.C. 1997), and a plaintiff is

---

[16] The phrase "substantial factor" is sometimes used, *see, e.g., Sinai v. Polinger Co.*, 498 A.2d 520, 528
(D.C. 1985), but this modifier may be misleading, as the issue is not one of degree—"[t]he rule is simply that
contributory negligence bars a plaintiff's recovery," *Wingfield v. Peoples Drug Store, Inc.*, 379 A.2d 685, 687 (D.C.
1977) (citing *Karma Constr. Co. v. King*, 296 A.2d 604, 605 (D.C. 1972)).

negligent when she "was unreasonable in encountering a known risk or a risk of which [s]he should have been aware," *Sinai*, 498 A.2d at 525.

"Ordinarily, questions of negligence and contributory negligence must be decided by the trier of fact." *Poyner*, 694 A.2d at 71 (citing *Washington v. A. & H. Garcias Trash Hauling Co.*, 584 A.2d 544, 545 (D.C. 1990)). Only "where the evidence, taken in the light most favorable to the plaintiff, establishes contributory negligence so clearly that no other inference can reasonably be drawn," should contributory negligence be decided as a matter of law at summary judgment. *Id.* (citing *District of Columbia v. Brown*, 589 A.2d 384, 387–88 (D.C. 1991)). And "[o]nly in the exceptional case is evidence so clear and unambiguous . . . ." *Tilghman v. Johnson*, 513 A.2d 1350, 1351 (D.C. 1986).

The factual dispute over the precise weather conditions on the Bridge the afternoon of the plaintiff's injury dooms D.C.'s argument that "Plaintiff's decision to walk across a high bridge surrounded by trees during a storm constitutes contributory negligence" as a matter of law. D.C.'s Mem. at 24. That dispute is obviously material to whether an ordinary reasonable person would have walked down Connecticut Avenue "under like circumstances." *Stager*, 494 A.2d at 1311. Another fact deepens the dispute: as the plaintiff emphasizes, citing the declaration of Kimbuende, the witness, multiple other people were on the Bridge with her. *See* Pl.'s D.C. Opp'n at 23 (citing Kimbuende Decl.). This fact undermines the District's inference that the plaintiff's decision to go to the pharmacy that afternoon was unreasonable.

The District likens this case to *Phillips v. Fujitec America*, Inc., 3 A.3d 324 (D.C. 2010), but *Phillips* involved no similar disputes. There, the plaintiff fell down an elevator shaft while attempting to crawl out a gap in the doors of a disabled elevator, ignoring admonitions not to attempt this. *Id.* at 326 & n.2. The parties in *Phillips* did not dispute the conditions that created

a risk of injury, and the absence of such a dispute, as well as the obvious (and warned-of) nature of the risk, made possible the conclusion that the plaintiff had been contributorily negligent as a matter of law.  *See id.* at 329–30 & n.16 (explaining that, even though "[t]ypically, reasonableness is a question for the jury," this type of "fact pattern" involving undisputed facts and clear warnings, allowed for resolution of contributory negligence at summary judgment, *id.* at 329 n.16).  Here, in contrast, the underlying conditions and the level of risk are disputed.

D.C. also suggests that the declared State of Emergency made it unreasonable as a matter of law for the plaintiff to go outside.  *See* D.C.'s Mem. at 23, 25 (referencing the state of emergency).  The United States makes a more sustained argument in this vein, so the point is considered with the United States' motion.

<em>c)      Assumption of Risk</em>

"The defenses of contributory negligence and assumption of risk may be viewed as 'intersecting circles, with a considerable area in common.'"  *Sinai*, 498 A.2d at 524 (quoting W. Prosser & W. Keeton, Law of Torts § 68, at 481 (5th ed. 1984)).  The elements of assumption of risk are, first, subjective "knowledge of the danger and second, a voluntary exposure to that known danger."  *Dougherty v. Chas. H. Tompkins Co.*, 240 F.2d 34, 35–36 (D.C. Cir. 1957).  While contributory negligence turns on what the plaintiff should have known, assumption of risk turns on what the plaintiff did know; as a result, while contributory negligence focuses on reasonableness, assumption of risk focuses on voluntariness.  *See Phillips*, 3 A.3d at 328.

The District's assumption of the risk defense fails for two reasons.  First, under D.C. law, when the question is whether "the plaintiff voluntarily but unreasonably accept[ed] a known risk created by the defendant's negligence, either defense could theoretically apply," but the D.C. Court of Appeals has—"in keeping with the Restatement (Second) of Torts—chose[n] to analyze such 'hybrids' as contributory negligence cases."  *Phillips*, 3 A.3d at 328 (discussing *Scoggins v.*

*Jude*, 419 A.2d 999, 1004 (D.C. 1980)).  Here, D.C. posits that the plaintiff "understood the risk of the storm" and chose to go out anyway, D.C. Mem. at 26, thereby placing this case in the "hybrid" category, *see Harris v. Plummer*, 190 A.2d 98, 100 (D.C. 1963) ("Assumption of risk involves voluntary or deliberate incurring of a known danger; contributory negligence generally involves inadvertence or failure to observe or act."); *see also Scoggins*, 419 A.2d at 1004–05 (similar).  Thus, the proper defense to consider is contributory negligence.  The District is not entitled to summary judgment on its contributory negligence defense for the reasons already stated.  *See supra* in Part III.A.3.b.

Second, the proffered assumption of risk defense fails because the record does not establish as a matter of law that the plaintiff had the requisite subjective knowledge.  "[T]he plaintiff must subjectively know of the existence of the risk and appreciate its unreasonable character."  *Sinai*, 498 A.2d 520, 524 (D.C. 1985) (citing Restatement (Second) of Torts § 496D (1965)).  To be sure, the plaintiff stated in her deposition that she "knew that there was a hurricane coming."  Pl.'s Dep. at 67:23.  Yet, when asked if she "recall[ed] if the news said when the hurricane would arrive," the plaintiff responded, "[t]hat *evening*"—that is, "[t]he *evening* of the 29th."  *Id.* at 68:23 to 69:9 (emphasis added).  That testimony could suggest to a trier of fact that the plaintiff was unaware of any unusual danger that *afternoon*.  Finally, as the District acknowledges, *see* D.C. Mem. at 26, the plaintiff also testified that she was unaware that the Mayor had declared a State of Emergency, Pl.'s Dep. at 68:16 to 68:21.  This aspect of her testimony further suggests that she did not understand there to be any serious danger that afternoon.  In short, the plaintiff's own testimony about her subjective knowledge makes it impossible to hold that she assumed the risk as a matter of law.

The United States' motion is considered next.

**B.      The United States' Motion for Summary Judgment**

The United States contends that it is entitled to summary judgment on two grounds. First, the United States argues that Bloch's report "fails to meet the standard required for competent expert testimony in a liability case" and, as a result, is inadmissible at trial to establish the relevant standard of care.  *See* U.S.'s Mem. at 15.  Second, the United States claims that the plaintiff was contributorily negligent as a matter of law because she did not "adhere to emergency management warnings."  U.S.'s Mem. at 8–12.  Neither contention is persuasive.

**1.      *Bloch's Report***

*a)      Legal Principles Relevant to the Admissibility of Bloch's Report*

Before expert testimony may be admitted at trial, Federal Rule of Evidence 702 and the Supreme Court's decision in *Daubert* require a district court to act as "gatekeep[er]" by "engag[ing] in a preliminary assessment of the scientific validity of the expert's reasoning or methodology." *Ambrosini*, 101 F.3d at 138 n.11 (citing *Daubert*, 509 U.S. at 592–93); *see also* FED. R. EVID. 702; *United States ex rel Miller v. Bill Harbert Int'l Const., Inc.*, 608 F.3d 871, 894 (D.C. Cir. 2010) ("[T]rial judges must act as gatekeepers to exclude unreliable expert testimony.").  Those rules require the party seeking to introduce the expert testimony to establish, by a preponderance of the evidence, the qualifications of the proffered expert and that: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."  FED. R. EVID. 702; *see also United States v. Hite*, 769 F.3d 1154, 1168 (D.C. Cir. 2014) ("Expert testimony is admissible under Federal Rule of Evidence 702 if it will assist the jury 'to understand the

evidence or determine a fact in issue.'" (quoting FED. R. EVID. 702(a)).  In other words, the party offering the expert need not prove that the expert's opinions are correct but rather that the expert is a qualified person who has reached his opinions in a methodologically reasonable manner.  *See Ambrosini*, 101 F.3d at 133 (explaining that courts "must focus solely on principles and methodology, not on the conclusions that they generate" (quoting *Daubert*, 509 U.S. at 595)); *see also Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 152–53 (1999) (stating that the trial court's job "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field").

Daubert motions are motions *in limine*, but "[t]he *Daubert* regime can play a role during the summary judgment phase of civil litigation."  *Cortés-Irizarry v. Corporación Insular de Seguros*, 111 F.3d 184, 188 (1st Cir. 1997); *see also Crowley v. Purdue*, 318 F. Supp. 3d 277, 291–92 (D.D.C. 2018) (citing *Carmichael v. West*, No. 12-cv-1969, 2015 WL 10568893, at *7 (D.D.C. Aug. 31, 2015)); 4 Jack B. Weinstein & Margaret A Berger, WEINSTEIN'S FEDERAL EVIDENCE, § 702.05[4] (Joseph M. McLaughlin, ed., Matthew Bender 2d ed. 2013).  A court "must be cautious—except when defects are obvious on the face of a proffer—not to exclude debatable scientific evidence [at summary judgment] without affording the proponent of the evidence adequate opportunity to defend its admissibility." *Cortés-Irizarry*, 111 F.3d at 188.[17] "In sum, the [U.S.] faces a steep burden to exclude expert testimony at this stage in the litigation."  *D.L. v. District of Columbia.*, 109 F. Supp. 3d 12, 28 (D.D.C. 2015).

---

[17] "Holding an evidentiary/*Daubert* hearing at the summary judgment stage would assuage any concern, but no evidentiary/*Daubert* hearing has yet been requested or held in this case."  *Carmichael*, 2015 WL 10568893 at *7 (internal citations omitted).

The United States acknowledges that excluding the Block Report at this stage of the litigation poses a difficult burden but nonetheless asserts that there should be "little difficulty in finding that Plaintiff's proffered exp[e]rt report clearly fails to meet the standard required for competent expert testimony in a liability case" because "Plaintiff's expert provides no methodology whatsoever in how he came to" his conclusions.  U.S.'s Mem. at 15.  On inspection, the United States' objections are misplaced, and Bloch's expert testimony meets the standard for admissibility for the purposes of summary judgment.

Two of the United States' attacks on the report are red herrings.  The United States observes that "Plaintiff's expert does not opine on where the limb came from . . . ."  U.S.'s Mem. at 16.  It also argues that Bloch does not "discuss the weather conditions experienced at the time of the accident," *id.*, even though Bloch does conclude that a healthy limb would not have "failed from the weather events," Bloch Report at 3.  At the same time, the United States makes no showing that consideration of these features of the incident is essential to establishing the standard of care, or breach of that standard, in a methodologically reasonable manner.  Although Bloch's failure to address these facts in his short, two-page report certainly makes the report's conclusions less believable, "believability" is an issue that can be "appropriately addressed through cross-examination."  *Heller*, 952 F. Supp. 2d at 142 (collecting cases); *see also, e.g.*, *Daubert*, 509 U.S. at 596 (citing various elements of the "adversary system" as "appropriate safeguards" against "shaky but admissible evidence").

The United States' other objections similarly "conflate[] the questions of the admissibility of expert testimony and the weight appropriately to be accorded such testimony by a fact finder."  *Ambrosini*, 101 F.3d at 141; *see also Lakie*, 965 F. Supp. at 55 (ruling that the defendant's objections to expert testimony "confuse[] . . . the crucial distinction between the

*admissibility* of expert testimony and the *weight* such testimony should be afforded by the trier of fact."). The United States faults Bloch's report: (1) for not identifying the species of tree from which the limb came, citing to testimony by Kirk, an NPS arborist, that the species of tree is relevant in risk assessment and tree-hazard identification, U.S.'s Mem. at 16 (citing Kirk Dep., 14:5 to 14:18; 16:5 to 16:8; 21:13 to 21:21); (2) for resting heavily on the observation that "[i]f this had been a live limb that fell, it would not have broken up in such small pieces," without backing that observation with citations to "arboreal texts" or any "citation to methodology," *id.* (quoting Bloch Report at 2); and (3) for "fail[ing] to provide any methodology or arboreal science as to how a particular inspection would have identified this particular limb as hazardous," *id.* The Bloch Report's silence as to these issues may represent "weak[nesses in the] factual basis for his testimony," *Heller*, 952 F. Supp. 2d at 140–41, but does not create "too great an analytical gap between the data and the opinion proffered" to admit the testimony for purposes of summary judgment, *Gen. Elec. Co. v. Joiner*, 552 U.S. 136, 146 (1997). Flaws that do not reach that threshold are more appropriately addressed through motions *in limine* or, ultimately, cross examination. *See Daubert*, 509 U.S. at 596.

Bloch's failure to identify the species of tree asks for a judgment about "the credibility of opposing" testimony—Bloch's and Kirk's—which courts cannot judge in determining the reliability of expert testimony. *See Ambrosini*, 101 F.3d at 140. Finally, the United States' criticism that Bloch does not use "any methodology" misses Bloch's certification that his conclusions "were developed, and this report prepared in conformity with . . . my expertise and experience as a consulting arborist." Bloch Report at 3; *see also* Pl.'s U.S. Opp'n at 13. This signals that Bloch's methodology was to "observe[] the relevant evidence" and "appl[y] [his] specialized knowledge" to that evidence. *Heller*, 952 F. Supp. 2d at 141 (quoting *Russell v.*

*Whirlpool Corp.*, 702 F.3d 450 457 (8th Cir. 2012)); *see also Kumho Tire Co.*, 526 U.S. at 150 (recognizing that "personal experience" can form the basis for expert testimony). That is a methodology "approved by courts in a variety of cases involving experts whose experience forms the basis of their opinions." *Heller*, 952 F. Supp. 2d at 141 (collecting cases); *see also Kumho Tire Co.*, 526 U.S. at 150 ("[T]he relevant reliability concerns may focus upon personal knowledge or experience."). Other courts have allowed such experienced-based testimony by expert arborists. *See Martin v. Norfolk So. Ry. Co.*, No. 16-cv-1191, 2018 WL 6840128, at *12 n.24 (Dec. 31, 2018) (concluding at summary judgment that "a registered arborist with many decades of experience" would "likely" "be able to provide an expert opinion" admissible under *Daubert*); *see also United States v. Black Hills Power, Inc.*, 03-cv-5020, 2006 WL 6908315, at *16 (denying a motion to strike the expert testimony of an arborist because those opinions were based "at least in part" on a published article and because "[a]s an expert in the field, [the arborist] can offer opinions based upon his experiences and observations."). That Bloch's report relies on his experience, not "rampant speculation," defeats the government's arguments about the report's lack of citations to methodology. *Heller*, 952 F. Supp. 2d at 140; *see also Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549, 568 (D.C. Cir. 1993) ("[A]dmission of expert testimony constitutes an abuse of discretion only when that testimony qualifies as 'rampant speculation'").

### 2. *Contributory Negligence*

The substantive tort law of the District applies to the plaintiff's FTCA action against the United States, so the legal principles related to contributory negligence already laid out, *supra* in Part III.A.3.b, apply to the United States' contributory negligence defense. *See* 28 U.S.C. § 1346(b)(1) ("[U]nder circumstances where the United States, if a private person, would be

liable to the claimant in accordance with the law of the place where the act or omission occurred.").

The United States argues that it is entitled to summary judgment because the plaintiff was contributorily negligent as a matter of law in disregarding "emergency management instructions." U.S.'s Mem. at 12. As support, the United States points out that "the District was under a state of emergency in which the District's Mayor and emergency management officials had warned residents to remain indoors between noon and after midnight due to the risk of falling trees, and when Plaintiff ventured out of her home to walk a tree-lined bridge at 3:15 p.m; a tree limb fell on her in conditions described as 'heavy rain and wind.'" *Id.* Yet, the plaintiff has put these and related facts in dispute. As the United States acknowledges elsewhere, Mayor Gray's shelter-in-place warning was publicized as applying to the storm's "peak." *See* U.S.'s Mem. at 11; *see also* Press Release (advising residents to "shelter in place during the peak of the storm"). A press release did predict that the "peak" would begin "about noon Monday, [October 29]," but, as already discussed, the plaintiff offers evidence, in Downs' expert report, that the storm had not in fact reached its "peak" by 3:15 that afternoon, at least on the Connecticut Avenue Bridge. *See* Downs Report at 3. Given this dispute, a trier of fact could question whether the plaintiff indeed "fail[ed] to adhere to emergency-management instructions." U.S.'s Mem. at 12.

Moreover, the available facts do not lead to a single inference that the plaintiff's decision to go outside when the warnings were in effect was unreasonable. To start, as the plaintiff emphasizes, citing the declaration of the witness Kimbuende, multiple other people were on the Bridge with her, suggesting that ordinary care may not have required staying inside. *See* Pl'.s U.S. Opp'n at 11 (citing Kimbuende Decl.). The plaintiff also observes that the State of

Emergency was in effect from October 26 until November 10, 2012, *see* D.C. Emergency Declaration at 3, which is well after the storm was over, *see* Pl.'s U.S. Opp'n at 10. That fact strains nearly to the breaking point the United States' argument that going outside during a state of emergency is negligent.

The United States implies that any "failure to adhere to emergency-management instructions constitutes a failure to employ reasonable care" as a matter of D.C. law, relying on a single, almost sixty-year-old, non-binding, out-of-jurisdiction case, for the idea that ordinary care requires, as a matter of law, a person to heed all emergency warnings. *See* U.S.'s Mem. at 11. That case, *Smith v. City of Kinston*, 105 S.E. 2d 648 (N.C. 1958), merely indicates that "it may be fairly inferred that" a resident of the area where a hurricane hit "knew of [a] hurricane and of the devastation wrought by it." *Id.* at 653. The United States also likens this case to *Krombein v. Gali Service Industries, Inc.*, 317 F. Supp. 2d 14 (D.D.C. 2004), which granted summary judgment on a contributory negligence defense when a plaintiff walked across a floor, despite one or two wet floor signs. *Id.* at 19. *Krombein* did not establish a per se rule that failure to adhere to a warning is negligent; instead, summary judgment was granted there because the plaintiff had not brought "to light any specific facts that create a genuine disputed issue between the parties." *Id.* Here, with facts in dispute, whether plaintiff's decision to go outside despite the warnings was unreasonable is a question for the trier of fact.

## IV. CONCLUSION

For the foregoing reasons, the motions for summary judgment by the District and the United States are DENIED. The parties are directed to confer and submit, by September 13, 2019, three proposed dates for trial of the plaintiff's claims.

An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date: September 9, 2019

_____
BERYL A. HOWELL
Chief Judge